AO 241
(Rev.10/07)

Page 2

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Eastern District of Louisiana | |
|---|---|---|
| Name (under which you were convicted): **PEDRO NAVARETTE-DURAN** | | Docket or Case No.: |
| Place of Confinement: **Louisiana State Penitentiary** | Prisoner No.: #575469 | **15 - 1230** |
| Petitioner (include name under which you were convicted) v. **PEDRO NAVARETTE-DURAN** | Respondent (authorized person having custody of petitioner) **N. Burl Cain, Warden** | **SECT. I MAG 3** |
| The Attorney General of the State of Louisiana: James Caldwell | | |

## PETITION

1.  (a)   Name and location of court that entered the judgment of conviction you are challenging:

    **Twenty-Fourth Judicial District Court, Parish of Jefferson.**

    (b)   Criminal docket or case number (if you know):
    **08-5641 Division "E"**

2.  (a)   Date of the judgment of conviction (if you know):
    **October 14, 2010.**
    (b)   Date of sentencing:
    **October 20, 2010.**

3.   Length of sentence:
    **Three (3) Life Sentences.**

4.   In this case, were you convicted on more than one count or more than one crime?
    [ ]  Yes      [ X ] No

5.   Identify all crimes of which you were convicted and sentenced in this case:
    **Second degree murder (La.R.S. 14:30.1), Three (3) Counts.**

6.   (a)   What was your plea? (Check one)

    [ X ]  (1)   Not guilty        [ ]  (3)   Nolo contendere (no contest)

    [ X ]  (2)   Guilty        [ ]  (4)   Insanity Plea

    If you entered a guilty plea to one count or indictment, and a not guilty plea to another count what did you plead guilty to and what did you plead not guilty to?

TENDERED FOR FILING

APR 17 2015

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

AO 241
(Rev.10/07)

(c)     If you went to trial, what kind of trial did you have? (Check one)
         [ X ]  Jury        [   ]  Judge only

7.     Did you testify at a pretrial hearing, trial, or post-trial hearing?

         [   ]  Yes        [ X ]  No

8.     Did you appeal from the judgment of conviction?

         [ X ]  Yes        [   ]  No

9.     If you did appeal, answer the following:

(a)     Name of court:  Fifth Circuit Court of Appeal.

(b)     Docket or case number (if you know): 11-KA-713

(c)     Result:  Sentence and Conviction Affirmed.

(d)     Date of result (if you know):  (La. 5 Cir. 3/13/12).

(e)     Citation to the case (if you know):

(f)     Grounds raised:  Sufficiency of Evidence.

(g)     Did you seek further review by a higher state court?  [ X ] Yes     [   ] No

         If yes, answer the following:

(1)     Name of court:  La. Supreme Court

(2)     Docket or case number (if you know):  2012-KO-0840.

(3)     Result:  Sentence and Conviction Affirmed.

(4)     Date of result (if you know:  (La. 11/9/12).

(5)     Citation to the case (if you know): 101 So.3d 950

(6)     Grounds raised:  Sufficiency of Evidence.

(h)     Did you file a petition for certiorari in the United States Supreme Court?

         [   ] Yes     [ X ] No

         If yes, answer the following:

(1)     Docket or case number (if you know):

(2)     Result:

(3)     Date of result (if you know):

(4)     Citation to the case (if you know):

10.     Other than the direct appeal listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? [ X ] Yes    [   ]  No

11.   If your answer to Question 10 was "Yes," give the following information:

    (a)    (1)    Name of court: Twenty-Fourth Judicial District Court.

            (2)    Docket or case number (if you know): 08-5641 Division "E".

            (3)    Date of filing (if you know):  December 27, 2012

            (4)    Nature of proceedings: Application For Post Conviction Relief.

            (5)    Grounds raised: Ineffective Assistance of Counsel.

            (6)    Did you receive a hearing where evidence was given on your petition, application, or motion?
                    [ ] Yes        [ X ]  No

            (7)    Result: Relief Denied w/o Prejudice (on motion of petitioner).

            (8)    Date of result (if you know): April 3, 2013.

    (b)    If you filed any second petition, application, or motion, give the same information:

            (1)    Name of court: Twenty-Fourth Judicial District Court.

            (2)    Docket or case number (if you know): 08-5641 Division "E".

            (3)    Date of filing (if you know): June 18, 2013

            (4)    Nature of proceeding: Application For Post Conviction Relief.

            (5)    Grounds raised: Denial of right to Appeal; Ineffective Assistance of Appeal Counsel; Ineffective Assistance of Trial Counsel; Invalid Jury Indictment; and Trial Court erred in Denying Motion to Quash.

            (6)    Did you receive a hearing where evidence was given on your petition, application, or motion?
                    [ ]  Yes        [ X ]  No

            (7)    Result: Relief Denied.

            (8)    Date of result (if you know):  Denied in part on September 13, 2013. Remaining claims denied on December 4, 2013.

    (c)    If you filed any third petition, application, or motion, give the same information:

            (1)    Name of court:

            (2)    Docket or case number (if you know):

AO 241
(Rev.10/07)

(3)     Date of filing (if you know):

(4)     Nature of proceeding:

(5)     Grounds raised:

(6)     Did you receive a hearing where evidence was given on your petition,
        application, or motion?
        [ ] Yes               [ ] No

(7)     Result:

(8)     Date of result (if you know):

(d)   Did you appeal to the highest state court having jurisdiction over the action
      taken on your petition, application, or motion?

      (1)    First petition:       [ ] Yes            [ X ] No

      (2)    Second petition:      [ X ] Yes          [ ] No

      (3)    Third petition:       [ ] Yes            [ ] No

(e)   If you did not appeal to the highest state court having jurisdiction, explain why
      you did not: **The First APCR was filed in error. It was subsequently
      dismissed without prejudice on Petitioner's motion.**

12.   For this petition, state every ground on which you claim that you are being held in
      violation of the Constitution, laws, or treaties of the United States. Attach additional
      pages if you have more than four grounds. State the facts supporting each ground.

      <u>CAUTION: To proceed in the federal court, you must ordinarily first exhaust
      (use up) your available state-court remedies on each ground on which you
      request action by the federal court. Also, if you fail to set forth all the grounds
      in this petition, you may be barred from presenting additional grounds at a later
      date.</u>

## GROUND ONE:

      The Evidence Was Insufficient to Find Pedro Navarette-Duran Guilty of
      Three Counts of Second Degree Murder Beyond a Reasonable Doubt.

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support
      your claim.):

      **(See Attached Memorandum in Support)**

AO 241
(Rev.10/07)

(b)  If you did not exhaust your state remedies on Ground One, explain why: **N/A**

(c)  **Direct Appeal of Ground One:**

   (1)  If you appealed from the judgment of conviction, did you raise this issue?
   [ **X** ] Yes   [   ] No

   (2)  If you did not raise this issue in you direct appeal, explain why:

(d)  **Post-Conviction Proceedings:**

   (1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
   [   ] Yes    [   ] No

   (2)  If your answer to Question (d)(1) is "Yes," state:

   Type of motion or petition:

   Name and location of the court where the motion or petition was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion or order, if available):

   (3)  Did you receive a hearing on you motion or petition? [   ]   Yes      [   ]  No

   (4)  Did you appeal from the denial of your motion or petition?  [   ]  Yes  [   ]  No

   (5)  If your answer to Question (d)(4) is "Yes," did you raise this issue on appeal?
   [   ]  Yes    [   ]  No

   (6)  If your answer to Question (d)(4) is "Yes," state:

   Name and location of the court where the appeal was filed:

   Docket or case number (if you know):

   Date of the court's decision:

   Result (attach a copy of the court's opinion, if available):

   (7)  If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)  **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your sate remedies on Ground One:

AO 241
(Rev.10/07)

13. Please answer these additional questions about the petition you are filing:

    (a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? [ X ] Yes   [ ] No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

    (b) Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not presented, and state your reasons for not presenting them: N/A

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition: [ ] Yes [ X ] No

    If "Yes," state the name and location of the court, the docket or case number, the type of proceedings, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? [ ] Yes [ X ] No

    If "Yes," state the name and location of the court, the docket of case number, the type of proceedings, and the claims raised.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

        (a) At preliminary hearing:  Tracy Sheppard

        (b) At arraignment and plea:  Tracy Sheppard

        (c) At trial:  Tracy Sheppard

        (d) At sentencing: Tracy Sheppard

        (e) On appeal: Pentice L. White.

        (f) In any post-conviction proceeding: Pro Se

        (g) On appeal from any ruling against you in a post-conviction proceeding:

17. Do you have any future sentences to serve after you complete the sentence for the judgment that you are challenging?   [ ] Yes   [ X ] No

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

AO 241
(Rev.10/07)

Page 8

(b)   Give the date the other sentence was imposed:

(c)   Give the length of the other sentence:

(d)   Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?  [   ] Yes     [   ] No

18.   TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

_____

*     The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA) as contained in 28 U.S.C. § 2244(d) provides in part that:

   (1)   A one-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State Court.  The limitation period shall run from the latest of -

      (A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
      (B)   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

      (C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

      (D)   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

   (2)   The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

AO 241
(Rev.10/07)

Therefore, petitioner asks that the Court grant the following relief:
or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

 

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true

and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing

system on _____ 4-16-15 _____ (month, date, year).

Executed (signed) on _____ 4-16-15 _____ (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why

petitioner is not signing this petition.

NUMBER: _____

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA


### PEDRO NAVARETTE-DURAN (575469)

### VERSUS

### N. BURL CAIN, WARDEN
### State of Louisiana


On Petition For Federal Habeas Corpus Pursuant to 28 U.S.C. §
2254, From The Twenty-Fourth Judicial District Court, Parish of
Jefferson, Case Number: 08-5641, Division "E", Judge John J.
Molaison, Jr., Presiding.


Respectfully submitted this 16 day of April, 2015.


_____
Pedro Navarette-Duran #575469
Main Prison, Spruce – 2
Louisiana State Penitentiary
Angola, Louisiana 70712

RECEIVED

APR 1 7 2015

Legal Programs Department

To:     Clerk, United States District Court
        Eastern District of Louisiana
        500 Poydras St., Room C-151
        New Orleans, LA 70130

From:   Pedro Navarette-Duran #575469
        Main Prison, Spruce – 2
        Louisiana State Penitentiary
        Angola, LA 70712

SCANNED at LSP and Emailed
4/17/15 by CM - 244 pages
date         initials   No.

Date:   April 16 , 2015

Re:     Pedro Navarette-Duran v. N. Burl Cain, Warden.

Dear Hon. Clerk,

        Please find enclosed:

1.   Petition under 28 U.S.C. § 2254, for Writ of Habeas Corpus;

2.   Memorandum In Support of § 2254;

3.   Appendix I – Direct Appeal/U.S. Supreme Court Exhibits;

4.   Appendix II – State Post Conviction Exhibits; and

5.   Motion for Leave to Proceed In Forma Pauperis.

        Please file these and send me notice of the same. Thanking you in
advance.

                                        Pedro Navarette-Duran, pro se

TABLE OF CONTENTS

MEMORANDUM IN SUPPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ACTION OF THE TRIAL COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FEDERAL QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TIMELINESS OF THIS PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CLAIM ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

AFFIDAVIT / CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . 17

APPENDIX – I (Direct Appeal Exhibits)

APPENDIX – I (State Post Conviction Exhibits)

## TABLE OF AUTHORITIES

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. §2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C.A. § 2254(d)(1), (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

La. R.S. 14:30.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

La. C.Cr.P. Art. 782(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

La. R.S.14:24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

Artuz v. Bennett, 121 S.Ct. 361, 531 U.S. 4 (2000) . . . . . . . . . . . . . . . . . . . . . . . 9

Austin v. Cain, 660 F.3d 880 (C.A. 5 (La.) 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 8

Carey v. Saffold, 122 S.Ct. 2134, 536 U.S. 214 (2002) . . . . . . . . . . . . . . . . . . . . 9

Foy v. Donnelly, 959 F.2d 1307 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . 11

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) . . . . . . 11

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) . . . . . . 7

Williams v. Taylor, 120 S.Ct. 1495, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . 8

Yarborough v. Alvarado, 124 S.Ct. 2140, 541 U.S. 652 (2004) . . . . . . . . . . . . . . . 8

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

State v. Cedrington, 98-0253, 725 So.2d 565 (La. App. 5 Cir. 12/16/98). . . . . . .14

State v. Dunn, 651 So.2d 1378, 1388-89 (La. App. 5 Cir. 2/15/95). . . . . . . . . .11

State v. Girod, 94-0853, 653 So.2d 664 (La. App. 5 Cir. 3/15/95). . . . . . . . . .13

State v. King, 06-0554, 951 So.2d 384 (La. App. 5 Cir. 1/16/07), writ denied, 07-0371, 956 So.2d 600 (La. 5/4/07). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

State v. Mason, 10-0284, 59 So.3d 419 (La. App. 5 Cir. 1/11/11). . . . . . . . . . .15

State v. Ortiz, 701 So.2d 922 (La. 10/21/97), cert. denied 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

State v. Pedro Navarette-Duran, 11-0073 (La. App. 5 Cir. 3/13/12). . . . . . . . . . 1

State v. Pedro Navarette-Duran, 101 So.3d 950 (La. 11/09/12). . . . . . . . . . . . .2

State v. Pierre, 93-0893, 631 So.2d 427 (La. 2/3/94). . . . . . . . . . . . . . . . . . 13

State v. West, 568 So.2d 1019, 1022 (La. 1990). . . . . . . . . . . . . . . . . . . . . .11

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PEDRO NAVARETTE-DURAN (575469)          CIVIL ACTION

VERSUS                                  NUMBER:

N. BURL CAIN, Warden                    MAGISTRATE:

                                        JUDGE:

MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT TO TITLE 28 U.S.C. § 2254.

MAY IT PLEASE THE COURT:

NOW INTO COURT comes PEDRO NAVARETTE-DURAN, pro se Petitioner, who respectfully presents this "Memorandum of Law in Support of Petition for Federal Writ of Habeas Corpus" pursuant to 28 U.S.C. §2254.

## STATEMENT OF THE CASE

On February 26, 2009, Pedro Navarette-Duran was indicted by the grand jury of Jefferson Parish for four counts of second degree murder, a felony in violation La. R.S. 14:30.1. He pled not guilty at the arraignment and moved to suppress his statement, the evidence seized, and the identification made. All motions were denied. On March 22, 2010, Navarette-Duran's motion to declare La. C.Cr.P. Art. 782(A) unconstitutional was also denied. However, his motion to quash Count Two of the indictment – La. R.S. 14:30.1, in relation to Beauford Gomez – was granted. Navarette-Duran was tried by a twelve-person jury for the

1

second degree murders of Wallace Gomez, Wayne Hebert, and Jeffery Carmadelle. The jury found him guilty on all counts. He was sentenced to life imprisonment at hard labor for each of the three convictions. The sentences were imposed without the benefit of probation, parole, or suspension of sentence and were ordered to run consecutively.

On March 13, 2012, Pedro Navarette-Duran convictions and sentences were affirmed by the Fifth Circuit Court of Appeal. See, State v. Pedro Navarette-Duran, 11-0073 (La. App. 5 Cir. 3/13/12). On November 9, 2012, Navarette-Duran's convictions and sentences became final when the Louisiana Supreme Court denied writs, State v. Pedro Navarette-Duran, 101 So.3d 950 (La. 11/09/12).

On December 27, 2012, Pedro Navarette-Duran filed his Application for Post Conviction Relief with the District Court. On April 3, 2013, that application was dismissed, on petitioner's motion and without prejudice. (Exhibits B & D).

On June 18, 2013, Navarette-Duran filed a second application for post conviction relief (APCR). On September 13, 2013, the District Court partially denied Petitioner's APCR and order the State to respond to the remaining claims. On December 4, 2013, the District Court denied Petitioner's remaining APCR claims.

On December 23, 2013, Petitioner filed a Notice of Intent to Seek Writs and timely filed an Application for Supervisory Writs with the Fifth Circuit Court of

2

Appeal. On March 28, 2014, the Court denied relief. On April 13, 2014, Petitioner applied for a Writ of Certiorari with the Louisiana Supreme Court. On January 16, 2015, the Louisiana Supreme Court denied relief.

Pedro Navarette-Duran now timely files the instant Petition for a Writ of Habeas Corpus, 28 U.S.C. § 2254.

## STATEMENT OF THE FACTS

Pedro Navarette-Duran, known to his friends as "Mariachi" relocated from El Salvador sometime between the years 2000 and 2001, to Katy, Texas and played small musical sessions in the Houston area.

Despite his love for music, Navarette-Duran needed a job and he knew only a few words of English. Since Hurricane Katrina, Navarette-Duran learned that a number of unemployed Latinos came to Louisiana seeking employment due to the federal grants the city received for rebuilding. Navarette-Duran thought that he might be able to get a job in Louisiana and perhaps find an opportunity to pursue his passion for music during his time off.

In October 2008, Navarette-Duran located Jose Cornejo-Garcia ("Garcia"), one of his cousins in the New Orleans area, and drove his car to his cousin's apartment in Metairie. Upon arriving in Metairie, Garcia welcomed Navarette-Duran into his home and allowed him to stay with him until he found a job.

A couple of days later, on October 30, 2008, Garcia, Renil Escobar-Riveria ("Escobar") and Rigoberto and Mario Funes decided to go to a local bar called

3

Gomez Bar. They asked Navarette-Duran to drive them there since he had a car. Unbeknownst to Navarette-Duran, however, Escobar, Garcia and the Funes brothers had been planning to rob a local bar that was known to cash payroll checks for workers at a nearby manufacturing company. When Navarette-Duran came to Garcia's apartment, the four men collectively agreed to use Navarette-Duran's car as a get-a-away vehicle. Thinking that he was going to the bar to unwind and drink some beer with the other men, Navarette-Duran drove to the bar and picked up the pool sticks to play a game of pool with his cousin.

When the Funes brothers pulled out their handguns and started ordering the patrons to give them their valuables, Navarette-Duran ran out of the bar. Navarette-Duran got into his car. He was nervous and he did not know what to do. He could speak only a few words of English and he knew that everyone was going to think that he was involved in the robbery because he was Hispanic and because he drove them to the bar.

He started the engine and was leaving, but he realized that his cousin, Garcia, was still in the bar. He was not going to leave his family behind. After all, he came to *Metairie* because he did not know anyone else and because he was staying with his cousin. Suddenly, Navarette-Duran heard a gunshot. His cousin did not come out of the bar and he saw people running out of the bar. Escobar got into the car and urged him to drive off, but Navarette-Duran did not want to leave Garcia. While he was watching the people run out of the bar, Navarette-Duran

4

heard more gunshots. Seconds later, he saw two of the men he was with carrying a third person who was covered in blood. It was at this point that he panicked and drove away. Rigoberto Funes, the individual who was shot on the scene by Wallace Gomez, the decedent bar owner, was arrested outside the bar.

Navarette-Duran drove to Escobar's apartment complex, but they went to the apartment of a young woman that Escobar knew. The woman allowed them inside to use the restroom. Navarette-Duran did not know who to trust – especially since his cousin had betrayed him. All he could think about was how he should not have gone with these men to that bar. Navarette-Duran could see how nervous the women in the apartment were when they saw that Escobar was covered with blood. Suddenly, Escobar started crying while they were sitting outside the woman's apartment. Brandi Diaz tried to console Escobar, but he cried all the more. Navarette-Duran could not understand what she was saying, but he knew that he did not need to be at the woman's apartment any longer that he had to.

The men ultimately left the apartment. Just as Navarette-Duran made arrangements to come to Metairie, he found himself making arrangements to leave. He went to Texas but was later arrested and questioned by Jefferson Parish deputies while in a Texas jail. He was cooperative and willingly talked to the police through their interpreter.

Navarette-Duran was charged in the deaths of three of the patrons killed in Gomez Bar on October 30, 2008.

## ACTION OF THE TRIAL COURT

During the trial, the State competently and more than adequately linked every piece of evidence in the robbery to each person charged in the indictment – except for Pedro Navarette-Duran. The State established that Navarette-Duran's DNA was on the beer bottles taken from the bar, and the glasses from Diaz's apartment. The State was successful in showing that the car Navarette-Duran used to drive to Louisiana had his fingerprints on the interior driver-side door.

Navarette-Duran *never* disputed the fact that he went into Diaz's apartment or that he was inside the bar drinking beer. Yet, the State failed to show that Navarette-Duran was integrally involved in either the armed robbery or the deaths of the three victims. Navarette-Duran did not have a gun in his hand at the time the bar patrons were robbed. Even the statements that Navarette-Duran supposedly made to the Louisiana police officers while he was held in custody by the State of Texas were suspect. Navarette-Duran was in the room with two police officers from the State of Louisiana, and there was no one there to protect his interest.

A Jefferson Parish deputy named David Canas testified that he, and he alone, translated Sgt. Keith Locascio's questions into Spanish and then translated Navarette-Duran's answers into English. The deputy had no formal training in translating statements for Spanish speaking detainees and considering that there may have been some discrepancies in Navarette-Duran's particular dialect as

6

opposed to the dialect that this deputy was accustomed to, no one, not even Navarette-Duran, could tell if what this deputy was saying was correct.

The officers said that Navarette-Duran was advised of his *Miranda*[1] rights, but since he did not have someone there to protect his interests, the officers' testimony was self-serving. In fact, we may never know exactly what Navarette-Duran told these officers in the Texas prison facility, and it is doubtful that the transcribed statement that the jury read during the trial was an accurate reflection of what he said. It was also highly suspicious that these officers spent at least one hour with Navarette-Duran during a pre-interview while they were alone with him in the Texas prison.

Accordingly, Pedro Navarette-Duran hopes that this Honorable Court find that the district court erred in adopting the jury's verdict against him because the State's evidence failed to establish that he held an incriminating role in this robbery. The State charged Navarette-Duran and later convicted him of second degree murder because he was Hispanic and because he went into the bar with other Hispanic men before the shooting occurred.

## FEDERAL QUESTIONS PRESENTED

Was The Evidence Was Insufficient to Find Pedro Navarette-Duran Guilty of Three Counts of Second Degree Murder Beyond a Reasonable Doubt?

---

[1]   *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966): Stating the a person being arrested must be told that he/she has the right to remain silent and that if they requested, an attorney will be appointed for them.

## GROUNDS FOR RELIEF

This petition for writ of habeas corpus is filed pursuant to 28 U.S.C. § 2254. Pedro Navarette-Duran is in the custody of respondent pursuant to a state court judgment of conviction that was obtained in violation of the Constitution of the United States.

In particular, Navarette-Duran represents that:

The Evidence Was Insufficient to Find Pedro Navarette-Duran Guilty of Three Counts of Second Degree Murder Beyond a Reasonable Doubt.

## STANDARD OF REVIEW

Pedro Navarette-Duran requests that federal habeas corpus relief be granted pursuant to 28 U.S.C. § 2254(d) for the following reasons: A petition for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C.A. § 2254(d)(1), (2).[2]

---

2  Williams v. Taylor, 120 S.Ct. 1495, 529 U.S. 362 (2000); Yarborough v. Alvarado, 124 S.Ct. 2140, 541 U.S. 652 (2004); Austin v. Cain, 660 F.3d 880 (C.A. 5 (La.) 2011).

## TIMELINESS OF THIS PETITION

A 1-year period of limitation shall apply to a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. The limitation period shall run from the latest of (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review. The time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection, 28 U.S.C.A. § 2244 (d)(2).[3]

Pedro Navarette-Duran's conviction and sentence became final on November 9, 2012. Navarette-Duran's time did not start running until February 9, 2013. His federal time ran until he filed a PCRA on December 19, 2012. However, the trial court dismissed the PCRA without prejudice, per Petitioner's request. On June 18, 2013, Petitioner filed his corrected PCRA, thus stopping his federal time. On January 16, 2015, the Louisiana Supreme Court denied Navarette-Duran's PCRA request for certiorari. Petitioner's federal time started running at this point. Navarette-Duran's respectfully presents the following claims for § 2254 relief.

---

3   Artuz v. Bennett, 121 S.Ct. 361, 531 U.S. 4 (2000); Carey v. Saffold, 122 S.Ct. 2134, 536 U.S. 214 (2002).

9

## CLAIM ONE

**The Evidence Was Insufficient to Find Pedro Navarette-Duran Guilty of Three Counts of Second Degree Murder Beyond a Reasonable Doubt.**

The crux of the State's case against Navarette-Duran rests on whether his actions clearly indicated that he was a willing participant in the armed robbery of Gomez Bar with the other four men. It remains undisputed even on appeal that the State satisfied the requisite elements for both armed robbery and second degree murder as to the other four defendant. Navarette-Duran challenges his conviction on the premise that he did not act as a principal to these offenses by intentionally aiding, abetting, or directly or indirectly counseling either of the co-defendant to commit these offense.

On appeal, Navarette-Duran asserted that he had no knowledge of the impending plan to rob the bar and he did not possess a crucial role in the armed robbery sufficient enough to be charged as a principal. Navarette-Duran's state of mind at the time he realized that three of the five men were going to rob the bar was to distance himself from them and vacate the premises. For this cause, the district court erred in accepting the jury's verdict and convicting him as a principal in the death of the three men.

Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[4]

---

4    See <u>State v. Ortiz</u>, 701 So.2d 922 (La. 10/21/97), <u>cert. denied</u> 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed. 2d 722 (1998).

Under the law of principals, a defendant can be found guilty of a felony offense if he served as a principal of the crime by aiding and abetting, directly/indirectly counseling, or procuring another to commit a crime.[5] So long as the prosecution is able to satisfy the statutory elements of the underlying offense as to one or all of the co-defendants, all that is left for it to do is show that the defendant acted in some way to assist the co-defendants toward accomplishing the felony offense.[6]

Here, the State used Navarette-Duran's presence in the bar as a sign of his intent to actively participate in the offense. The State also used the fact that Navarette-Duran was the only one of the five men to have a car as a sign that he was the "*wheelman*"[7] for the group.

Again, it was discussed at trial that Navarette-Duran was present in the bar for the purpose of playing a game of pool and socializing with his cousin and his cousin's friend. Undeniably, Navarette-Duran did not have the specific intent to kill or harm any of the bar patrons. Further, he did not have the mental element to even participate in an armed robbery of a commercial business to which he had no familiarity.[8] He could not speak any English and he had never been in Louisiana

---

5   See LSA-14:24 (West 2011); see also Foy v. Donnelly, 959 F.2d 1307 (5th Cir. 1992), (quoting Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed 2d 560 (1979).

6   See State v. West, 568 So.2d 1019, 1022 (La. 1990).

7   A term coined by the State in its closing arguments to allegedly convince the jury of Navarette-Duran's status as a principal. See Trial Record p. 609.

8   See State v. Dunn, 651 So.2d 1378, 1388-89 (La. App. 5 Cir. 2/15/95).

11

before. Thus, to assume that he possessed the knowledge and intent to be charged as a principal in this offense is unreasonable. In addition, when the event turned from a friendly outing into a robbery, Navarette-Duran quickly exited the bar and would have immediately left the area if it were not for the fact that his cousin was still inside the bar and he had no where to go if he left his cousin behind.

In *Foy*,[9] the defendant was convicted of armed robbery in state court. After exhausting his state-court remedies, the defendant filed a petition for writ of habeas corpus in the federal district court. The federal district court denied his petition, and the defendant appealed to the United States Fifth Circuit. According to the facts, a co-defendant named Shelbia robbed a fast-food restaurant in New Orleans between midnight and 1:30 a.m. Shelbia used a handgun in the robbery by pointing the gun to one of the employee's heads and ordering them to give him the money in the cash register. After getting the money, Shelbia told the employees to lie face down on the floor as he made his exit from the restaurant. None of the employees saw Shelbia leave and they did not know if he left on foot or by car.

The employees reported the incident to the police and while the responding officer was en route to another location for the same fast-food restaurant, the officer saw a man fitting the description given by the restaurant employees from the first robbery leaving another restaurant. The officer also notice Shelbia

---

9    See <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1310-1315 (5th Cir. 1992)

getting into a vehicle driven by the defendant. Both men were subsequently arrested and Foy, the man driving the car, was charged as a principal in both robberies. In affirming the defendant's conviction, the U.S. Fifth Circuit rejected the defendant's argument that he was not a principal in these robberies because the defendant's alibi witnesses could not place him at home during the time of the first robbery. Also, the defendant was an assistant manager, making him immediately familiar with this restaurant's procedures. Further, the defendant dropped a handgun while running from the police following the second robbery.

In this case, Navarette-Duran did not purposefully position himself in his vehicle t wait for the other four men to compete the robbery so they could leave. Navarette-Duran ran to his car out of shock. He was actually terrified about what these men were doing.[10] He did not leave because his cousin was still in the bar and because he had no where to go nor did he have a way to get into his cousin's apartment to get his belongings. He did not have a handgun as did the defendant in *Foy*, and he did not exhibit any knowledge about the bar or where the owners kept their money.[11]

Considering that Navarette-Duran arrived in New Orleans just a couple of days before the incident, it is difficult, at best, to understand how he knowingly participated in the planning or execution phase of this crime.[12]

---

10  See Trial Record p. 1037.
11  See Trial Record p. 975.
12  See State v. Pierre, 93-0893 (La. 2/3/94), 631 So.2d 427, and State v. Girod, 94-0853 (La. App. 5 Cir. 3/15/95), 653 So.2d 664.

Interestingly, the State could have elected to prosecute Brandi Diaz and Donna Lopez as principals in this armed robbery because these women permitted the men to come into their apartment to use the restroom and get a drink – despite the fact that one of them was covered in blood and holding a large object in a shirt also covered in blood.[13] But the State did not charge these women as principals.

The men stayed in the apartment for close to an hour and Diaz was given some of the money from the robbery. Diaz was a recovering addict who smoked during her pregnancy and who kept company with a man that her husband did not like. Surely, the law of principals could have applied to these women even more than to Navarette-Duran.

In its effort to demonstrate Navarette-Duran's intent to participate in this crime, the State attempted to use Brandi Diaz's testimony about what she supposedly heard Escobar say to implicate Navarette-Duran.

> An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state;[14] further, the mental state of one defendant may not be imputed to another defendant.[15]

---

13  See trial Record p. 838.
14  See also State v. Cedrington, 98-0253 (La. App. 5 Cir. 12/16/98), 725 So.2d 565, 574.
15  See State v. King, 06-0554, pp. 7-8 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-0371 (La. 5/4/07), 956 So.2d 600.

Defense counsel timely objected to the State's attempt at using hearsay evidence to implicate Navarette-Duran.[16] Defense counsel strenuously argued that the use of this hearsay testimony would violate Navarette-Duran's Sixth Amendment right to cross-examine his accusers since Escobar had already been convicted at the time of Navarette-Duran's trial and would undoubtedly *plea the fifth*[17] if the defense were to call him as a witness.[18] The district court ruled to limit Diaz's testimony to what she heard and saw and not include what Escobar or anyone else said while the men were in the apartment.[19] Naturally, the State strenuously objected to the court's ruling. The State even used sarcasm towards the district court judge and it was quite aggressive with the court when it did not receive the ruling it expected.[20] The State even went so far as to appeal to the trial judge's history as a former prosecutor to get the initial ruling reversed.[21]

This was a horrible crime and a terrible tragedy to the victims' families and to those patrons who frequented Gomez Bar for the past four decades. However, Navarette-Duran was not a party to this armed robbery and murder. He never actively participated in the offenses and he did not aid, abet or counsel any of the four men in this incident. Unfortunately, Navarette-Duran was convicted because he was the same nationality as the other four men with him. He almost no English

---

16  See Trial Record p. 826.
17  See Trial Record pp. 796-811.
18  See generally, <u>State v. Mason,</u> 10-0284 (La. App. 5 Cir. 1/11/11), 59 So.3d 419.
19  See Trial Record p. 806.
20  See Trial p. 398.
21  See Trial Record p. 822.

and was unemployed. All Navarette-Duran had was a compact car and a willingness to work.[22] This is why he was in Louisiana in the first place.

The State's case-in-chief was comprised of evidence that implicated the other four men, but not Navarette-Duran. The other four men either planned the entire robbery, brandished firearms to intimidate the bar owners and their patrons or took valuables from their pockets. Navarette-Duran, on the other hand, was in the wrong place and with the wrong people. He initially trusted his cousin, Garcia, but that turned out to be disappointing for him.[23] Although Escobar was the mastermind behind the robbery, Navarette-Duran was in his company following the robbery only because he was virtually homeless without his cousin. He did not condone the robbery. If Navarette-Duran was not engaged in the perpetration of an armed robbery then he could not be convicted as a principal in the deaths of the three men who were killed in the robbery.[24]

Hence, the guilty verdict entered against Navarette-Duran in this case could not satisfy the *Jackson* standard of review because a rational trier of fact could not logically believe that the State's evidence proved that he was a principal in this robbery beyond a reasonable doubt. Pedro Navarette-Duran was denied his Sixth and Fourteenth Amendment right to Due Process and a Fair Trial. This Honorable Court should grant Pedro Navarette-Duran's request for Habeas Corpus Relief.

---

22  See Trial Record p. 424.
23  See Trial Record p. 277, wherein Garcia identified Navarette-Duran when he was questioned by the police.
24  See Trial Record p. 770.

16

## CONCLUSION AND PRAYER

Pedro Navarette-Duran submits claims to this Honorable Court based on egregious violations of his constitutional rights, and thus requests the granting of this petition under 28 U.S.C. § 2254(d)(1).

Respectfully Submitted By:

Pedro Navarette-Duran #575469

## AFFIDAVIT / CERTIFICATE OF SERVICE

I do hereby swear and affirm that the foregoing is true and correct to the best of my knowledge and belief.

I do hereby certify that the foregoing has been served upon:

Opposing Counsel:
Paul D. Connick, Jr., D.A.
Parish of Jefferson
200 Derbigny St., 5th Fl.
Gretna, LA 70053

by placing a copy of same in a properly addressed envelope into the hands of the Classification Officer for mailing. Also, a copy to the Court has been sent via electronic mailing. Done this ___16___ day of April, 2015.

Pedro Navarette-Duran #575469
Main Prison, Spruce – 2
Louisiana State Penitentiary
Angola, Louisiana 70712

17

NUMBER: _____

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

PEDRO NAVARETTE-DURAN (575469)

VERSUS

N. BURL CAIN, WARDEN
*State of Louisiana*

# APPENDIX – I
## DIRECT APPEAL

A — Original Brief By Appellate Counsel.

B — Original Brief by the State of Louisiana.

C — Fifth Circuit Court of Appeal's Judgment & Order.

D — Petition for Writ of Certiorari to the Louisiana Supreme Court.

E — Louisiana Supreme Court's denial, Affirming Conviction and Sentence.

F — Sentencing Transcript.

# STATE OF LOUISIANA

## COURT OF APPEAL, FIFTH CIRCUIT

---

### DOCKET NUMBER: 11-KA-0713

---

### STATE OF LOUISIANA
Respondent-Appellee

**VERSUS**

### PEDRO A. NAVARETTE-DURAN
Defendant-Appellant

---

AN APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON,
STATE OF LOUISIANA

THE HONORABLE JOHN J. MOLAISON, JR., PRESIDING

DOCKET NO: 08-5641;  DIV. "E"

---

### AN ORIGINAL BRIEF ON BEHALF OF
### DEFENDANT-APPELLANT, PEDRO A. NAVARETTE-DURAN

**SUBMITTED BY:**

**LOUISIANA APPELLATE PROJECT**

**PRENTICE L. WHITE** (LA. BAR NO: 24250)
APPELLATE COUNSEL
P.O. BOX 74385
BATON ROUGE, LOUISIANA 70874
TELEPHONE: (225) 235-2928

**(CRIMINAL APPEAL)**

A

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ACTION OF THE TRIAL COURT . . . . . . . . . . . . . . . . . . . . . . . . . 6

ISSUE FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ASSIGNMENT OF ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

ARGUMENT OF ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**APPENDICES (MINUTES OF JUDGMENT OF CONVICTION)**

## TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

**FOY v. DONNELY,**
959 F. 2d 1307 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

**JACKSON v. VIRGINIA,**
443 U. S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) . . . . . . . 10, 14

**STATE v. CEDRINGTON,**
98-0253 (La. App. 5 Cir. 12/16/98), 725 So. 2d 565 . . . . . . . . . . . . . 13

**STATE v. DUNN,**
94-0776 (La. App. 5 Cir. 2/15/95), 651 So. 2d 1378 . . . . . . . . . . . . 10

**STATE v. GIROD,**
94-0853 (La. App. 5 Cir. 3/15/95), 653 So. 2d 664 . . . . . . . . . . . . . 11

**STATE v. KING,**
06-0554 (La. App. 5 Cir. 1/16/07), 951 So. 2d 384,
*writ denied* 07-0371 (La. 5/4/07), 956 So. 2d 600 . . . . . . . . . . . . . . 13

**STATE v. MASON,**
10-0284 (La. App. 5 Cir. 1/11/11), 59 So. 3d 419 . . . . . . . . . . . . . . 13

**STATE v. ORTIZ,**
96-1609 (La. 10/21/97), 701 So. 2d 922,
*cert. denied* 524 U. S. 943, 118 S. Ct. 2352,
141 L. Ed. 2d 722 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATE v. PIERRE,**
93-0893 (La. 2/3/94), 631 So. 2d 427 . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATE v. WEST,**
568 So. 2d 1019 (La. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**

LSA-Const. Art. 5 Sec. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
LSA-R.S. 14:24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
LSA-R.S. 14:30.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
LSA-R.S. 14:30.1(A)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
LSA-C.Cr.P. art. 930.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
LSA-C.Cr.P. art. 912.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATEMENT OF JURISDICTION

Jurisdiction of the Court vests under the provisions of Article 5, Section 10 of the Louisiana Constitution 1974. The Louisiana Constitution grants the Courts of Appeal appellate jurisdiction of all criminal cases trial by a jury except those wherein a death penalty was imposed. Additionally, this Court of Appeal has jurisdiction over this matter pursuant to Article 912.1 of the Louisiana Code of Criminal Procedure.

## STATEMENT OF THE CASE

On February 26, 2009, the Grand Jury for Jefferson Parish indicted[1] the defendant/appellant, Pedro Navarette-Duran (Duran), for three counts of Second Degree Murder, which is a violation of LSA-R.S. 14:30.1(A)(2). The State brought the indictment against Duran and four other co-defendants--Jose Cornejo-Garcia (Garcia), Renil Escobar-Rivera (Rennie), and Rigoberto Funes (Funes), and his brother, Mario A. Funes.

All four men were originally charged together and all of them were first charged with First Degree Murder. The State elected to indict them on Second Degree Murder. The State and all five of the defendants, including their attorneys and their respective interpreters engaged in a lengthy discovery process because three deaths occurred during an armed robbery following a violent shootout in a local bar in Jefferson Parish named Gomez Bar.

During the discovery proceedings, Duran, along with several other co-defendants, attempted to have their statements to the police and several items of evidence suppressed before the hearing, but the district court denied all discovery

---

[1]See Trial Record p. 29.

motions except the motion[2] to sever[3] which it granted some time before the instant trial. The State's evidence consisted of five Hispanic men conspiring to commit an armed robbery of a local bar that had a forty-year history[4] of cashing checks[5] for employees at an insulation business located directly across the street from the bar. On October 20, 2008, the men traveled to the bar and entered the establishment that afternoon. The men order some beers and appeared to be interested in playing a game of pool until two of the men pull out their handguns and started ordering the patrons to surrender their valuables.[6]

One of the owners later cornered Mario Funes, who was standing behind the cash register. A gunfight ensued and ended with the bar owner and two patrons being killed. Funes was severely injured. Duran immediately ran outside the bar and got into his car.[7] He was not armed, and he was not identified as being one of the men who took the patron's valuables[8] from their pockets. Actually, Duran arrived in the New Orleans area a couple of days earlier and had been staying with his cousin who was one of the Hispanic men involved in the robbery. To Duran, he was simply going to the bar to relax and unwind. He had no idea that the men had conspired to rob this bar.

At trial, Duran did not dispute the fact that several patrons were violently killed during the gunfight[9] nor did he dispute the fact that he owned the vehicle that was parked outside the bar. However, Duran was not a participant in this robbery. None

---

[2] See Trial Record p. 563.

[3] See Trial Record p. 54.

[4] See Trial Record p. 754.

[5] See Trial Record p. 59.

[6] See Trial Record p. 762.

[7] See Trial Record p. 678.

[8] See Trial Record p. 695.

[9] See Trial Record p. 725.

of the patrons remembered seeing him either in the bar or holding a gun to the patrons. Duran entered the bar with these men, but he was not an active participant with them in their scheme to rob this bar.   Duran was forced to leave his cousin, Garcia, at the bar out of fear that he would be implicated in this crime. When Mario Funes was shot, Duran was scared out of his mind. He spoke[10] very little English, so he knew that he was already at a disadvantage. His will to survive and get away from this situation was all Duran had left. He eventually left Louisiana and went to Texas. It was in Texas that he was later arrested and then questioned by the police about the robbery through a police interpreter.

The jury returned a guilty verdict against Duran based on his menial association with these men, not because he willingly or actively wanted to rob this business with the others.   Defense counsel filed a post-trial motion entitled Motion In Arrest of Judgment and Alternatively Motion For New Trial, but this motion was summarily denied.   Defense counsel waived all sentencing delays and Duran was sentenced to three consecutive LIFE sentences pursuant to the mandatory sentence provision of LSA-R.S. 14:30.1.

The sentences were ordered to be without the benefits of parole, probation or suspension of sentence. Duran was also advised of the two-year period for filing an Application for Post Conviction Relief pursuant to LSA-C. Cr. P. Art. 930.8. It is from his conviction and sentence for three counts of Second Degree Murder that Duran files the instant appeal.

## STATEMENT OF FACTS

Pedro Navarette-Duran has been involved with music since he was a young boy. He adored everything about music. He loved listening to it because it had a soothing

---

[10]See Trial Record p. 775.

effect on the brain and was a wonderful way to relieve stress. More importantly, Duran enjoyed playing music. In fact, everyone knew of his love of music and referred to him as Mariachi,[11] which a group of singing musicians who incorporate the use of violins, trumpets and guitars to play a genre of music that originated from Western Mexico.

Despite his love of music, Duran needed a job and he knew very little English. Since Hurricane Katrina, Duran learned that a number of unemployed Latinos came to Louisiana seeking employment due to the federal grants the city received for rebuilding. Duran thought that he might be able to get a job in Louisiana and perhaps get a chance to pursue his passion for music during his off time.

In October 2008, Duran located Jose Cornejo-Garcia, one of his cousins in the New Orleans area, and drove his car to his cousin's apartment in Metairie. Upon arriving in Metairie, Garcia welcomed Duran into his home and allowed him to stay with him until he found a job.

A couple of days later, on October 30, 2008, Garcia, Rennie, and the Funes brothers decided to go to a local bar called Gomez Bar. They asked Duran to drive them there since he had a car. Unbeknownst to Duran, Rennie, Garcia and the Funes brothers had been planning to rob a local bar that was known to cash payroll checks for workers at a nearby manufacturing company. When Duran came to Garcia's apartment, the three men collectively agreed to use Duran's car as their get-a-away vehicle. Thinking that he was going to the bar to unwind and drink some beers with other men like himself, Duran drove to the bar and picked up the pool sticks to play a game of pool with his cousin. When the Funes brothers pulled out their handguns and started ordering the patrons to give them their valuables, Duran ran out of the bar. Duran got into his car. He was nervous and he did not known what to do. He spoke

---

[11] See Trial Record p. 995.

very little English and he knew that everyone was going to think that he was involved in the robbery because he was Hispanic and because he drove them to the bar.

He started the engine and started to leave, but he realized that his cousin, Garcia, was still in the bar. He was not going to leave his family behind. After all, he came to Metairie because he did not know anyone else and because he was staying with his cousin. Suddenly, Duran heard a gunshot. His cousin had not come out of the bar and he saw people running out of the bar. Rennie got into the car and urged him to drive off, but Duran did not want to leave Garcia. While he was watching the people run out of the bar, Duran heard more gunshots. Seconds later, he saw two of the men he was with carrying a third person who was covered in blood.[12]  In his rearview mirror, Duran saw a police car driving down the street. It was at this point that he panicked and drove away. Rigoberto Funes, the individual who was shot on the scene by Wallace Gomez, the decedent bar owner, was arrested outside the bar.[13]

Duran drove to Rennie's apartment complex, but they went to the apartment of a young woman that Rennie knew. The woman allowed them inside to use the restroom.[14]  Duran did not know who to trust–especially since his cousin had betrayed him. All he could think about was how he should not have gone with these men to that bar. Duran could see how nervous the women in the apartment were when they saw that Rennie was covered in blood. Rennie also had a handgun wrapped in a T-shirt[15] that was covered in blood.[16]  Suddenly, Rennie started crying while they were sitting

---

[12]See Trial Record p. 820.

[13]See Trial Record p. 246.

[14]See Trial Record p. 441.

[15]See Trial Record p. 992.

[16]See Trial Record p. 786.

outside the women's apartment.[17] Brandi Diaz tried to console Rennie, but Rennie cried all the more. Duran could not understand what she was saying, but he knew that he did not need to be at the women's apartment any longer than he had to.

The men ultimately left the apartment. Just as Duran made arrangement to come to Metairie, he found himself making arrangements to leave. He went to Texas but was later arrested and questioned by Jefferson Parish deputies in a Texas jail. He was cooperative[18] and willingly talked to the police through their interpreter. Duran was charged in the deaths of three of the patrons killed in Gomez Bar on October 30, 2008.

## ACTION OF THE TRIAL COURT

During the trial, the State competently and more than adequately linked every piece of evidence in the robbery to each person charged in the indictment–expect for Pedro Navarette-Duran. The State established that Duran's DNA was on the beer bottles[19] taken from the bar, and the glasses[20] from Diaz's apartment. The State was successful in showing that the car Duran used to drive to Louisiana had his fingerprints on the interior driver-side door.[21]

Duran never disputed the fact that he went into Diaz's apartment or that he was inside the bar drinking beer. Yet, the State failed to show that Duran was integrally involved in either the armed robbery of the deaths of the three victims. Duran did not have a gun in his hand at the time the bar patrons were robbed. Even the statements

---

[17]See Trial Record p. 788.

[18]See Trial Record p. 1003.

[19]See Trial Record p. 890.

[20]See Trial Record p. 786.

[21]See Trial Record p. 873.

that Duran supposedly made to the Louisiana police officers while he was held in custody by the State of Texas were suspect.  Duran was in the room with two police officers from the State of Louisiana, and there was no one there present to protect his interest.  A Jefferson Parish deputy named David Canas[22] testified that he, and he alone, translated Sgt. Keith Locascio questions into Spanish[23] and then translated[24] Duran's answers into English.  This deputy had no formal training in translating statements for Spanish speaking defendants and considering that there may have been some discrepancies in Duran's particular dialect as oppose to the dialect that this deputy was accustomed to, no one--not even Duran--could tell if what this deputy was saying was correct.[25]  The officers said that Duran was advised of his *Miranda* rights, but since Duran did not someone present to protect[26] his interest, the officers' testimony was self-serving.[27]  In fact, we may never know exactly what Duran told these officers in that Texas prison facility, and it is doubtful that the transcribed statement that the jury read during the trial was an accurate reflection of what Duran said.  It was also highly suspicious that these officers spent at least one hour with Duran during a pre-interview[28] while they were alone[29] with him in the Texas prison.[30]

Accordingly, the district court erred in adopting the jury's verdict against Duran

-----

[22]See Trial Record p. 364.

[23]See Trial Record p. 240.

[24]See Trial Record p. 315.

[25]See Trial Record p. 289.

[26]See Trial Record pp. 906, 907.

[27]Id.

[28]The police interrogation with the other co-defendants was in excess of ten hours according to one of the detectives who testified for the State. See Trial Record p. 254.

[29]See Trial Record p. 1004.

[30]See Trial Record p. 243.

because the State's evidence[31] failed to establish that Duran held an incriminating role in this robbery. The State charged Duran and later convicted of second degree murder because he was Hispanic and because he came into the bar with the other Hispanic men before the shooting occurred.

## ISSUE FOR REVIEW

1. Did the district court commit reversible error in accepting the jury's guilty against Duran when the State's evidence showed that Duran was a Hispanic man who was in the bar with a group of other Hispanic men until several people were robbed and killed during a robbery?

## ASSIGNMENT OF ERROR

1. Duran drove to Louisiana in search of employment. He had a relative who lived in the New Orleans area, and he intended to stay with his relative until he found employment and could live on his own. Little did he know that his cousin had been plotting with three[32] other men to rob a local bar that was known to have large sums of cash on the premises. This bar cashed checks for employees at the Johns Manville Company, which is a manufacturing company that was located directly across the street from Gomez Bar.

The men told Duran that they were going to the bar to play pool, and Garcia, Duran's cousin, asked Duran to drive them to the bar. Duran had only been in Louisiana for a few days and since he was staying with his

---

[31]See Trial Record p. 215.

[32]See Trial Record p. 776.

cousin free of charge, he felt obliged to drive the men to the bar. Duran's

limited understanding of the English language made him a prime target for

these men. They took advantage of Duran and his car. Duran went from

playing a friendly game of pool to being wanted for murder in a matter of

seconds. Duran was not a principal to this crime because he lacked the

criminal intent to participate in this horrible incident. Duran had only met

his cousin's friends a few days earlier. To say that he was an active

participant in the robbery and in the death of these men is totally

unreasonable and thus, manifestly erroneous.

## LAW AND ARGUMENT

### *Insufficiency of the Evidence*

The crux of the State's case against Duran rests on whether Duran's actions

clearly indicated that he was a willing participant in the armed robbery of Gomez Bar

with the other four men. While it remains undisputed even on appeal that the State

satisfied the requisite elements for both armed robbery and second degree murder as

to the other four defendants. Duran challenges his conviction on the premise that he did

not act as a principal to these offenses by intentionally aiding, abetting, or directly or

indirectly counseling either of the co-defendants to commit the said offenses.

On appeal, Duran asserts that he had no knowledge of the impending plan to rob

the bar and he did not possess a crucial role in the armed robbery sufficient enough to

be charged as a principal. Duran's state of mind at the time he realized that three of the

five men were going to rob the bar was to distance himself from them and vacate the

premises. For this cause, the district court erred in accepting the jury's verdict and

convicting him as a principal in the death of the three men.

Ultimately, all evidence, both direct and circumstantial, must be sufficient to

support the conclusion that the defendant is guilty beyond a reasonable doubt.[33] Under the law of principals, a defendant can be found guilty of a felony offense if he served as a principal of the crime by aiding and abetting, directly/indirectly counseling, or procuring another to commit a crime.[34] So long as the prosecution is able to satisfy the statutory elements of the underlying offense as to one or all of the co-defendants, all that is left for it to do is show that the defendant acted in some way to assist the co-defendants towards accomplishing the felony offense.[35]

Here, the State used Duran's presence in the bar as a sign of his intent to actively participate in the offense. The State also used the fact that Duran was the only one of the five men to have a car as a sign that he was the *"wheelman"*[36] for the group. Again, it was discussed at trial that Duran was present in the bar for the purpose of planning a game of pool and socializing with his cousin and his cousin's friends. Undeniably, Duran did not have the specific intent to kill or harm any of the bar patrons. Further, he did not have the mental element to even participate in an armed robbery of a commercial business to which he had no familiarity.[37] He could not, virtually, speak an English and he had never been in Louisiana before. Thus, to assume that he possessed the knowledge and intent to be charged as a principal in this offense is unreasonable. In addition, when the event turned from a friendly outing into a robbery, Duran quickly exited the bar and would have immediately left the area if it were not for the fact that his cousin was still inside the bar and he had no where to go

---

[33]See *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So. 2d 922, *cert. denied* 524 U. S. 943, 118 S. Ct. 2352, 141 L. Ed. 2d 722 (1998).

[34]See LSA-14.24 (West 2011); see also *Foy v. Donnelly*, 959 F. 2d 1307 (5ᵗʰ Cir. 1992), (quoting *Jackson v. Virginia*, 443 U. S. 307, 316, 99 S. Ct. 2781, 2787, 61 L. Ed. 2d 560 (1979).

[35]See *State v. West* 568 So. 2d 1019, 1022 (La. 1990).

[36]A term coined by the State in its closing arguments to allegedly convince the jury of Duran's status as a principal. See Trial Record p. 609.

[37]See *State v. Dunn*, 94-0776 (La. App. 5 Cir. 2/15/95), 651 So. 2d 1378, 1388-89.

if he left his cousin behind.

In *Foy*,[38] the defendant was convicted of armed robbery in state court. After exhausting his state court remedies, the defendant filed a petition for writ of habeas corpus in the federal district court. The federal district court denied his petition, and the defendant appealed to the United States Fifth Circuit. According to the facts, a co-defendant named Shelbia robbed a fast-food restaurant in New Orleans between midnight and 1:30am. Shelbia used a handgun in the robbery by pointing the gun to one of the employees' heads and ordered them to give him the money in the cash register. After getting the money, Shelbia told the employees to lie face down on the floor as he made his exit from the restaurant. None of the employees saw Shelbia leave and they did not know if he left on foot or by car.

The employees reported the incident to the police and while the responding officer was en route to another location for the same fast-food restaurant, the officer saw a man fitting the description given by the restaurant employees from the first robbery leaving another restaurant. The officer also noticed Shelbia getting into a vehicle driven by the defendant. Both men were subsequently arrested and Foy, the man driving the car, was charged as a principal in both robberies.

In affirming the defendant's conviction, the U. S. Fifth Circuit rejected the defendant's argument that he was not a principal in these robberies because the defendant's alibi witnesses could not place him at home during the time of the first robbery. Also, the defendant and his wife were former employees of the same fast-food outlets and the defendant was an assistant manager, making him intimately familiar with this restaurant's procedures. Further, the defendant dropped a handgun while running from the police following the second robbery.

---

[38]See *Foy v. Donnelly*, 959 F. 2d at 1310-1315.

In this case, Duran did not purposefully position himself in his vehicle to wait for the other four men to complete the robbery so they could leave. Duran ran to his car out of shock. He was actually terrified[39] about what these men were doing. He did not leave because his cousin was still in the bar and because he had no where to go nor did he have a way to get into his cousin's apartment to get his belongings. Duran did not have a handgun[40] as did the defendant in *Foy*, and he did not exhibit any knowledge about the bar or where the owners kept their money. Considering that Duran arrived in New Orleans just a couple of days before the incident, it is difficult, at best, to understand how he knowingly[41] participated in the planning or execution phase of this crime.

Interestingly, the State could have elected not to prosecute Brandi Díaz and Donna Lopez as principals in this armed robbery because these women permitted the men to come into their apartment to use the restroom and get a drink--despite the fact that one of them was covered in blood and holding a large object in a shirt also covered in blood.[42] But the State did not charge these women as principals. The men stayed in the apartment for close to an hour and Diaz was given some of the money from robbery.[43] Diaz was a recovering addict who smoked during her pregnancy[44] and who kept company with a man that her husband did not like.[45] Surely, the law of principals could have applied to these women even more than to Duran.

---

[39]See Trial Record p. 1037.

[40]See Trial Record p. 975.

[41]See *State v. Pierre*, 93-0893 (La. 2/3/94), 631 So. 2d 427, and *State v. Girod*, 94-0853 (La. App. 5 Cir. 3/15/95), 653 So. 2d 664.

[42]See Trial Record p. 838.

[43]Id.

[44]Id.

[45]See Trial Record p. 837.

To further illustrate how what evidence the State had to show Duran's intent to participate in this crime, it attempted to use Brandi Diaz's testimony about what she supposedly heard Rennie say to implicate Duran.

> An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental[46] state; further, the mental state of one defendant may not be imputed to another defendant.[47]

Defense counsel timely objected to the State's attempt at using hearsay evidence to implicate Duran. Defense counsel strenuously argued that the use of this hearsay[48] testimony would violate Duran's Sixth Amendment right to cross-examine his accusers since Rennie had already been convicted at the time of Duran's trial and would undoubtedly plea *the fifth*[49] if the defense were to call him as a witness.[50] The district court ruled to limit Diaz's testimony to what she heard and saw and not include what Rennie or anyone else said while the men were in the apartment.[51] Naturally, the State strenuously objected to the court's ruling. The State even used sarcasm towards the district court and it was quite aggressive[52] with the court when it did not receive the ruling it expected. The State even went so far as to appeal the trial judge's history as a former prosecutor to get the initial ruling reversed.[53]

This was a horrible crime and a terrible tragedy to the victims' families and to those patrons who frequented Gomez Bar for the past four decades. However, Duran

---

[46] See also *State v. Cedrington*, 98-0253 (La. App. 5 Cir. 12/16/98), 725 So. 2d 565, 574.

[47] See *State v. King*, 06-0554, pp. 7-8 (La. App. 5 Cir. 1/16/07), 951 So. 2d 384, 390, *writ denied*, 07-0371 (La. 5/4/07), 956 So. 2d 600.

[48] See Trial Record p. 826.

[49] See Trial Record pp. 796-811

[50] See generally, *State v. Mason*, 10-0284 (La. App. 5 Cir. 1/11/11), 59 So. 3d 419.

[51] See Trial Record p. 806.

[52] See Trial Record p. 398.

[53] See Trial Record p. 822.

was not a party to this armed robbery. He never actively participated in the offense and he did not aid, abet or counsel any of the four men in this incident. Unfortunately, Duran was convicted because he was of the same nationality as the other four men with him. He spoke very little English and he was unemployed. All Duran had was a compact car[54] and a willingness to work. That is why he was in Louisiana in the first place.

The State's case-in-chief was comprised of evidence that implicated the other four men, but not Duran. The other four men either planned the entire robbery, brandished firearms to intimidate the bar owners and their patrons or took valuables from their pockets. Duran, on the other hand, was in the wrong place and with the wrong people. He initially trusted his cousin, Garcia,[55] but that turned out to be very disappointing for him. Although Rennie was the mastermind behind the robbery, Duran was in his company following the robbery only because he was virtually homeless without his cousin. He did not condone the robbery. If Duran was not engaged in the perpetration of an armed robbery then he could not be convicted as a principal in the deaths of the three men who were killed in the robbery.[56]

Hence, the guilty verdict entered against Duran in the instant matter could not satisfy the *Jackson* standard of review because a rational trier of fact could not logically believe that the State's evidence proved that Duran was a principal in this robbery beyond a reasonable doubt.

## CONCLUSION

The defendant/appellant, Pedro Navarrette-Duran, requests that this Honorable

---

[54] See Trial Record p. 424.

[55] See Trial Record p. 277, wherein Garcia identified Duran when he was questioned by the police.

[56] See Trial Record p. 770.

Court vacate his convictions for three counts of second degree murder and remand his case back to the district court because the State failed to satisfy the *Jackson* standard of review.   In other words, the State did not adequately show that Duran was a principal in the armed robbery of Gomez Bar.

RESPECTFULLY SUBMITTED

**LOUISIANA APPELLATE PROJECT**

**PRENTICE L. WHITE** (La. Bar Roll No: 24250)
P.O. BOX 74385
BATON ROUGE, LOUISIANA 70874-4385
TELEPHONE: (225) 235-2928

ATTORNEY FOR APPELLANT,
Pedro Navarette-Duran.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the above and foregoing appellate brief has been served upon opposing counsel by depositing the same in the U.S. Mail, at Baton Rouge, Louisiana, this 19th day of August, 2011.

PRENTICE L. WHITE

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

---

NO. 11-KA-713

---

STATE OF LOUISIANA,
APPELLEE

VERSUS

PEDRO A. NAVARETTE-DURAN,
APPELLANT

---

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 08-5641, DIVISION "E",
THE HONORABLE JOHN J. MOLAISON, JR., JUDGE PRESIDING.

---

BRIEF OF THE STATE OF LOUISIANA, APPELLEE

---

PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
24th JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA

DESIRÉE M. VALENTI # 29464*
TERRY M. BOUDREAUX # 3306
APPELLATE COUNSEL
ASSISTANT DISTRICT ATTORNEYS
DISTRICT ATTORNEY'S OFFICE
GRETNA, LOUISIANA 70053

*COUNSEL OF RECORD ON APPEAL

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ASSIGNMENTS OF ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LAW & ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IN THE

FIFTH CIRCUIT COURT OF APPEAL

FOR THE

STATE OF LOUISIANA

NO. 11-KA-713

STATE OF LOUISIANA,
APPELLEE

VERSUS

PEDRO A. NAVARETTE-DURAN,
APPELLANT

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF JEFFERSON, STATE OF LOUISIANA,
NO. 08-5641, DIVISION "E",
THE HONORABLE JOHN J. MOLAISON, JR., JUDGE PRESIDING.

BRIEF OF THE STATE OF LOUISIANA, APPELLEE

## STATEMENT OF THE CASE

On February 26, 2009, the defendant, together with four co-defendants, was

charged by grand jury indictment with four counts of second degree murder, in

violation of LSA-R.S. 14:30.1. (R. pp.1-3; 29). On March 6, 2009, the defendant

pled not guilty at arraignment. (R. p.5). On July 16, 2009, the trial court granted

the State's Motion to Obtain Buccal Swab. (R. p.10). On September 2, 2009, the

trial court denied defense Motions to Suppress Statement and Identification. (R.

p.11). On November 10, 2009, the trial court ruled on Motions to Suppress

Evidence, both admitting and excluding specific items. (R. p.12). On February

11, 2010, the trial court granted the defendant's Motion to Sever and ordered that

all defendants be tried separately. (R. p.15). On March 22, 2010, the trial court

denied defendant's Motions to Quash the Indictment and Declare La.C.Cr.P. art. 782 (A) Unconstitutional. (R. pp.16-7). The trial court additionally granted the defendant's Motion to Quash the Bill of Indictment as to Count 2 only. (R. pp.16-7). On October 14, 2010, a 12-person jury found the defendant guilty as charged. (R. pp.22-8). On October 20, 2010, the trial court denied defense Motion for New Trial. (R. p.132). On that date, the trial court sentenced the defendant to imprisonment at hard labor for a term of life on each count to be served consecutively, without benefit of parole, probation or suspension of sentence. (R. p.132). On October 22, 2010, the trial court granted defense Motion for Appeal. (R. p.134).

The matter is now before this Honorable Court on direct appeal.

## ISSUE PRESENTED

Whether the evidence was sufficient to prove beyond a reasonable doubt that the defendant acted as a principal to the commission of the charged offenses?

## LAW & ARGUMENT

The defendant maintains that under the law of principals, his mere presence at the scene of the robbery is insufficient to show he had the requisite mental state, and that he aided and abetted his co-defendants in the murders. The State, however, submits that the evidence presented is sufficient for a rational trier of fact to find the defendant guilty of three counts of LSA-R.S. 14:30.1, second degree murder, beyond a reasonable doubt. Louisiana Revised Statute § 14:24 defines principals as follows:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

2

LSA-R.S. 14:24. Moreover, only those persons who "knowingly participate in planning or execution of a crime" are principals to that crime. *State v. Page*, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, *writ denied,* 38 So.3d 299, 09-2684 (La. 6/4/10); *State v. Pierre*, 93–893, p. 4 (La.2/3/94), 631 So.2d 427, 428; *State v. King*, 06–554, pp. 7–8 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, *writ denied*, 07–371 (La.5/4/07), 956 So.2d 600. Although the mere presence at the scene of a crime does not make one a principal to the crime, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." *State v. Anderson*, 97–1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225.

Furthermore, a finding that the defendant acted with the specific intent to kill or inflict great bodily harm is unnecessary when the human being is killed and the offender is engaged in the perpetration or attempted perpetration of an armed or simple robbery. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. LSA-R.S. 14:30.1; *State v. Hill*, 98-1087 (La.App.5 Cir. 8/31/99), 742 S0.2d 690; *State v. McNeal*, 34,593 (La.App. 2 Cir. 4/40/01), 785 So.2d 957; *State v. Lewis*, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583.

Instantly, the defendant's own admissions together with the testimony of witnesses at trial prove beyond a reasonable doubt that the defendant actively participated in the planning and execution of a robbery gone bad as well as participated in the escape and discarding of evidence to avoid

3

apprehension and to conceal his and his co-defendants' crimes.

At trial, the State introduced into evidence the defendant's voluntary statement to police taken in Houston, Texas, followed by the Marshalls' apprehension of the defendant after fleeing Louisiana.  In that statement, the defendant admitted he was involved in the planning of the robbery of the Gomez bar.  (SE 69, pp.6-7).  Furthermore, the defendant explained that he was to follow Renil Escobar-Rivera's lead once inside the bar. (SE 69, p.7). The defendant further admitted that he drove himself and the four co-defendants to the bar in his car on the day of the robbery. (SE 69, p.8).  The defendant explained that he backed into a parking spot once they arrived at the bar. (SE 69, p.8).  The defendant also admitted to police that he drove himself and Renil Escobar-Rivera away from the crime scene, leaving behind the other three co-defendants. (SE 69, p.12-4).  The defendant further admitted that he and Renil Escobar-Rivera fled to two different apartments in an effort to hide and that he and Renil Escobar-Rivera discarded of evidence, namely gloves, in a dumpster. (SE 69, pp.15, 17). The defendant then admitted fleeing Louisiana with Renil and two men headed for Mexico. (SE 69, p.17).  The defendant again admitted his intention to assist in robbing the bar. (SE-69, p.17).

Additionally at trial, Mr. Keith Cummings, a bar patron, testified.  Of significance, Mr. Cummings testified that at no time did the perpetrators argue or fight amongst themselves. (R. pp.748-9).

Ms. Brandi Diaz also testified at trial.  Ms. Diaz testified that she previously knew Renil Escobar-Rivera and that on the date of the robbery, Renil and the defendant came to her apartment in Tallowtree. (R. pp.782-3;

990). Ms. Diaz testified that Renil asked to use the bathroom and spent 10–15 minutes inside the bathroom with the bath water running. (R. p.785). Ms. Diaz testified that the defendant asked her for something to drink. (R. p. 784). Ms. Diaz testified that she observed defendant with two pistols wrapped inside of a shirt. (R. p.784). Ms. Diaz testified that while Renil began to cry, the defendant remained unemotional and repeatedly told Renil to be quiet when Renil began to speak of the incident at the bar. (R. p.788). Ms. Diaz testified that the men were at her apartment for approximately 30-45 minutes.

Ms. Donna Lopez testified at trial that she was also at Ms. Diaz' home when Renil and the defendant arrived. Ms. Lopez testified that both men used the bathroom and heard the bath water running. (R. p.817). Ms. Lopez testified that the men asked if they could leave a shirt at their home. (R. p.821). Ms. Lopez told them they could not and that they had to leave, as she was scared when she saw the blood on the clothing. (R. p.822-29). Ms. Lopez testified that she observed the men put something inside a garbage bag and leave the apartment. (R.p.822).

Chad Pitfield, of the JPSO crime scene unit, testified that he lifted the defendant's fingerprints off the interior driver door handle of the Honda used in the commission of the robbery. (R. p.873).

Connie Brown also testified as to the DNA evidence that was processed regarding the defendant. Ms. Brown testified that the defendant's DNA was present on a Miller Lite bottle recovered from inside the Gomez bar and also present on a discarded cigarette butt recovered from the patio of Ms. Diaz's apartment. (R. pp.889-90).

In *State v. McNeal*, 34,593 (La.App. 2 Cir. 4/40/01), 785 So.2d 957, 970, the Second Circuit upheld defendant's conviction as a principle to second degree murder, where a robbery ended in homicide. The court found that the record contained direct evidence of the defendant's participation as a principle to the murder in the form of defendant's own voluntary recorded statements to investigators. In finding the statements sufficient to prove the defendant's culpability as a principle, the court held,

> These statements, viewed in the light most favorable to the prosecution, show beyond a reasonable doubt that Defendant was involved in the commission of the murder, even though he did not admit that he directly committed the murder. Defendant's role in the murder, according to his fourth and last recorded statement, was to be the "look-out" for Foster and Nute; and, having acted as such, Defendant aided and abetted in the commission of the resulting murder.

*Id.* at 970. Additionally, in *State v. Hill*, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, this court upheld defendant's murder conviction as a principle, where a robbery had gone awry. Just as in *State v. McNeal*, supra, this court found the defendant's admissions to police to be sufficient evidence of his involvement as a principle. This court stated:

> Hill was at the murder scene with knowledge by his own admission that McPherson planned to rob Reverend Smith and he (Hill) remained with McPherson. Hill said or did nothing to prevent the crime and he did not come to Reverend Smith's aid after the shooting. Instead, he and McPherson fled. From this evidence, the jury found that Hill was at least a principal. We cannot say the *Jackson v. Virginia* standard was not satisfied. It is not the function of this Court to assess credibility or reweigh evidence.

*Hill*, at 697. Furthermore, in *State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05, 917 So.3d 583, this court found, just as in *State v. Hill*, supra, 1) defendant was at the murder scene with a gun; 2) defendant did nothing to prevent the crime; 3) defendant fled the scene rather than rendering

6

assistance after the victim was shot; and 4) defendant did not attempt to report the shooting. *Lewis*, at 591. This court reasoned, as it similarly did in *State v. Meyers*, 95-750 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, 1383, that the jury could have reasonably inferred that the defendant knew the purpose of confronting the victim, a known drug dealer, in the early morning hours, armed with guns. *Lewis*, at 591. See also, *State v. Page*, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442.

Similarly, here, the defendant by his own admissions admitted his intention to assist in the robbery of the bar. During the commission of the robbery, Mr. Keith Cummings testified that the defendant and accomplices did not argue or fight amongst themselves, indicating that the defendant was complicit in the robbery. Additionally, the defendant admitted that he was in fact the wheel-man of the operation. He drove his accomplices to the bar in his vehicle and fled the scene of the robbery/murders in his vehicle with Renil Escobar-Rivera. The defendant neither assisted the victims of the shootings, nor did he call the police to report the crimes. Furthermore, Ms. Diaz' testimony indicates that the defendant was not frightened or worried after the robbery/ murders, as he appeared quite calm, silencing Renil Escobar-Rivera as he began to tell Ms. Diaz of the crime. Moreover, the defendant with Renil Escobar-Rivera hid themselves, disposed of evidence of the crimes, and fled Louisiana to avoid apprehension and prosecution. The defendant's statements together with the testimony of witnesses more than sufficiently proves beyond a reasonable doubt that the defendant aided and abetted his co-defendants in the commission of the robbery and resulting murders. As such, this claim lacks merit.

## CONCLUSION

The State of Louisiana respectfully asks this Honorable Court to affirm the conviction and sentence of Pedro A. Navarette-Duran.

Respectfully Submitted,

DESIRÉE M. VALENTI #29464
ASSISTANT DISTRICT ATTORNEY
200 DERBIGNY STREET
DISTRICT ATTORNEY'S OFFICE
GRETNA, LOUISIANA 70053
(504) 368-1020

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served on all parties by placing same in the United States mail, postage prepaid, this 27th day of SEPTEMBER, 2011.

DESIRÉE M. VALENTI

8

MARION F. EDWARDS
CHIEF JUDGE

SUSAN M. CHEHARDY
CLARENCE E. McMANUS
WALTER J. ROTHSCHILD
FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON

JUDGES



**FIFTH CIRCUIT**
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

PETER J. FITZGERALD, JR.
CLERK OF COURT

GENEVIEVE L. VERRETTE
CHIEF DEPUTY CLERK

MARY E. LEGNON
FIRST DEPUTY CLERK

TROY A. BROUSSARD
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF MAILING

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN MAILED ON OR DELIVERED THIS DAY <u>MARCH 13, 2012</u> TO THE TRIAL JUDGE, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

PETER J. FITZGERALD, JR
CLERK OF COURT

# 11-KA-713

TERRY M. BOUDREAUX
ASSISTANT DISTRICT ATTORNEY
PARISH OF JEFFERSON
200 DERBIGNY STREET
GRETNA, LA 70053

PRENTICE L. WHITE
ATTORNEY AT LAW
LOUISIANA APPELLATE PROJECT
P. O. BOX 74385
BATON ROUGE, LA 70874

BRUCE G. WHITTAKER
ATTORNEY AT LAW
LOUISIANA APPELLATE PROJECT
P. O. BOX 791984
NEW ORLEANS, LA 70179-1984



FILE FOR RECORD

STATE OF LOUISIANA          2012 MAR 13   AM 11:40          NO. 11-KA-713

                                    DEPUTY CLERK
VERSUS                     5TH CIRCUIT COURT OF APPEAL          FIFTH CIRCUIT
                               STATE OF LOUISIANA

PEDRO A. NAVARRETE-DURAN                                COURT OF APPEAL

                                                       STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 08-5641, DIVISION "E"
HONORABLE JOHN J. MOLAISON, JR., JUDGE PRESIDING


March 13, 2012


## FREDERICKA HOMBERG WICKER
### JUDGE


Panel composed of Judges Susan M. Chehardy, Clarence E. McManus, and
Fredericka Homberg Wicker


PAUL D. CONNICK, JR.
   District Attorney
TERRY M. BOUDREAUX
DESIRÉE M. VALENTI
      Assistant District Attorneys
      Parish of Jefferson
      200 Derbigny Street
      Gretna, LA 70053
      COUNSEL FOR PLAINTIFF/APPELLEE

PRENTICE L. WHITE
      Attorney at Law
      Louisiana Appellate Project
      P. O. Box 74385
      Baton Rouge, LA 70874
      COUNSEL FOR DEFENDANT/APPELLANT


**AFFIRMED**

This is the last in a series of cases to come before this Court involving the murders that occurred on October 30, 2008, at the Gomez Bar. This appeal involves the defendant/appellant, Mr. Pedro Navarrete-Duran's ("Navarrete-Duran"), involvement in an armed robbery that ultimately resulted in the deaths of four men. Navarrete-Duran was sentenced to imprisonment at hard labor to three consecutive life sentences after being convicted of three counts of second degree murder. He contends that the evidence was insufficient to support the convictions as a principal to second degree murder. For the reasons that follow, the convictions and sentences are affirmed.

**Factual and Procedural Background**

Navarrete-Duran relocated from El Salvador sometime between the years of 2000 and 2001 to Katy, Texas and later met Jose Garcia-Cornejo ("Garcia") in Houston, Texas in August of 2008. The two men, who were both musicians,

collaborated and played small musical sessions in the Houston area. Navarrete-Duran and Garcia later traveled from Texas to New Orleans in Navarrete-Duran's 2006 Honda Accord to look for work. They arrived in New Orleans on Monday, October 27, 2010, where they met Renil Escobar-Riveria ("Escobar"), for the first time, on Bourbon Street. Navarrete-Duran informed Escobar that he and Garcia had no place to live. Escobar then invited the two men to reside with him at his apartment on Orange Blossom – an apartment complex in Jefferson Parish, Louisiana. When the men arrived at Escobar's apartment on Monday night, they also met the Funes brothers – Rigoberto and Mario – for the first time. Together, these five men would conspire to commit the armed robbery that would occur three days later at the Gomez Bar.

On Wednesday, October 29, 2008, the night before the robbery, Escobar informed the other four men that they would rob the bar where the old men were because a lot of cash was stored there.[1] Escobar supplied the weapons for the robbery, arming himself with a .357 magnum, while providing Mario and Rigoberto with a .380 semi-automatic and a .22 handgun, respectively. Navarrete-Duran's contribution to the crime was the use of his 2006 Honda Accord.

The next day, October 30, 2008, the five men got inside Navarrete-Duran's car and traveled to Gomez Bar to commit the robbery. Navarrete-Duran was in the driver's seat; Mario sat next to him in the front passenger's seat; and Escobar, Garcia and Rigoberto were seated in the rear. Once the men arrived at the bar, Navarrete-Duran backed into a parking space near the front entrance. The men then exited the bar and went inside. Escobar and the Funes brothers concealed their weapons. Navarrete-Duran and Garcia were unarmed.

---

[1] Gomez Bar was a community bar that also provided check cashing services.

The five men played pool and drank beer for approximately twenty minutes. Suddenly, Escobar brandished his weapon and disappeared into a back room while holding a gun to the back of the co-bar owner's head. Meanwhile, the other four men began robbing the bar patrons – removing contents from their pockets. A shot was fired from the back, and Escobar came running back into the bar yelling "let's go." Navarrete-Duran, Garcia, Rigoberto, and Escobar fled from the bar, but Mario remained inside. Mario was behind the bar counter picking up money that had fallen from the cash register. When the other four men got outside, Navarrete-Duran jumped into the driver's seat of his vehicle, and Garcia jumped into the front passenger seat. Upon hearing more shots from within the bar, the men realized Mario was still inside. Escobar and Rigoberto returned to the bar with their guns drawn.

Inside the bar, Mario lie wounded on the floor. Wallace Gomez, one of the bar owner's, was dead on the floor near the pool table. His brother, Beauford Gomez, was also dead on the floor near the bar. Seeing his brother on the floor, presumably dead, Rigoberto immediately opened fire with his .22, firing multiple shots and ultimately killing two other bar patrons. Rigoberto and Escobar then dragged Mario from the bar and headed toward the front door.

Meanwhile, outside of the bar, Mr. Charles Henning was parked next to the Honda Accord, which was occupied by the two Hispanic males. While sitting there, Mr. Henning's friend opened his truck door and asked whether he heard gunshots. Mr. Henning, however, had not heard anything because his windows were rolled up, and the truck's engine and air conditioner were running. When Mr. Henning looked up, he noticed that the man in the driver's seat of the Honda Accord was staring directly at him and appeared to be extremely nervous. He then looked towards the bar and observed three men exiting – one of whom had blood

dripping from his head and abdomen.  Observing this suspicious behavior, Mr.

Henning backed out of the parking lot into an adjacent lot.  The Honda Accord,

which was parked next to him, had backed into the parking space, which allowed

Mr. Henning the opportunity to jot down the front Texas license plate number.

After Rigoberto and Escobar exited the bar with Mario, they observed a

police officer driving down the street.  Escobar abandoned the two men, jumped in

the back seat of Navarrete-Duran's car and ordered Garcia out to help the Funes

brothers.  When Garcia exited the car, however, Escobar held a gun to the back of

Navarrete-Duran's head and ordered him to drive away.  Navarrete-Duran drove to

the Tallowtree Apartments where Brandi Lopez, Escobar's friend, lived.  While

there, Navarrete-Duran and Escobar drank water from separate wine glasses.

Brandi noticed blood on Escobar's clothing and asked him what was wrong.  He

explained that he and Navarrete-Duran had gotten into a fight down the street.

Escobar then went into the bathroom to clean up.  Afterwards, Brandi, Escobar,

and Navarrete-Duran went outside where they each smoked cigarettes, discarding

the butts on the ground.

While outside, Brandi observed a shirt on the ground that she had seen

Escobar wear numerous times.  When she picked the shirt up, two guns fell out.

Escobar picked up the guns off the ground, wrapped them back in the shirt, and

took a towel that was hanging on the outside railing and wrapped it around the

shirt.  Brandi then told the two men to leave.  As they stood there, however,

police began to fill the area.  Escobar cried and told Brandi that he thought Mario

was dead.  While Escobar was speaking, Navarrete-Duran continually ordered him

to be quiet.  The two men eventually fled the scene and hid in a canal until

sundown.

The police obtained the license-plate number of the 2006 Honda Accord from Mr. Henning and learned that it was registered to Navarrete-Duran. The investigation ultimately led them to the Tallowtree Apartments, where the car had been abandoned. Upon questioning residents in the area, police learned that the occupants of the car had been seen entering apartment 406. The police went to that apartment where Brandi and Donna Lopez – the actual leaseholder – confirmed that the two men had been there. The police then obtained a consent to search the apartment, and seized, *inter alia,* a wine glass and the three cigarette butts that had been discarded on the ground. Later that evening, the police escorted Mr. Henning to the Tallowtree Apartments, where he identified the 2006 Honda Accord as the same car he had seen at the Gomez Bar earlier that day.

Approximately one week after the murders occurred, Navarrete-Duran was arrested in Houston, Texas. Det. Keith Locascio, the lead detective, along with Det. David Canas, traveled to Houston on November 7, 2008, to interview Navarrete-Duran. Det. Canas, who was fluent in both Spanish and English, accompanied Det. Locascio for the sole purpose of serving as a translator for both Navarrete-Duran and Det. Locascio. When the detectives arrived in Houston, Navarrete-Duran was advised of his *Miranda* rights in Spanish. He also signed a Spanish Rights of Arrestee form in which he indicated that he understood his rights and wished to waive them.

Navarrete-Duran stated that he and Garcia, whom he had only known for about two months, arrived in New Orleans the Monday before the robbery. He further stated that he did not know Escobar or the Funes brothers before arriving in New Orleans. He stated that Escobar had planned the robbery the night before it occurred and that he was present during that meeting. He admitted driving his car to and from the robbery but stated that he was not armed with a weapon.

-6-

On February 26, 2009, a grand jury indicted Navarrete-Duran with four counts of second-degree murder in violation of La. R.S. 14:30.1.[2] He pled not guilty at the arraignment and moved to suppress his statement, the evidence seized, and the identification made. All motions were denied. On March 22, 2010, Navarrete-Duran's motion to declare La. C.Cr.P. art. 782(A) unconstitutional was also denied. However, his motion to quash Count Two of the indictment – La. R.S. 14:30.1 in relation to Beauford Gomez – was granted.[3] Navarrete-Duran was tried by a twelve-person jury for the second degree murders of Wallace Gomez, Wayne Hebert, and Jeffrey Carmadelle. The jury found him guilty on all counts. He was sentenced to life imprisonment at hard labor for each of the three convictions. The sentences were imposed without the benefit of probation, parole, or suspension of sentence and were ordered to run consecutively.

**Discussion**

In his sole assignment of error, Navarrete-Duran contends that the evidence was insufficient to convict him as a principal to second degree murder.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virgina*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In this case, Navarrete-Duran was convicted of three counts of second degree murder, a violation of La. R.S. 14:30.1. Second degree murder is the

---

[2] Garcia, Mario, Rigoberto, and Escobar were also charged in the same indictment for second-degree murder. However, their cases were later severed, and the men were ordered to be tried separately.
[3] It was determined that Beauford Gomez was killed by a bullet fired from Wallace Gomez's weapon.

-7-

killing of a human being when the offender is engaged in the perpetration or

attempted perpetration of certain enumerated felonies, included armed robbery.

La. R.S. 14:30.1 (A)(2).   The evidence in this case overwhelmingly indicates that

Navarrete-Duran was not armed with a weapon during the commission of the

armed robbery that occurred at the Gomez Bar.  However, La. R.S. 14:24 provides:

> [A]ll persons concerned in the commission of a crime, whether
> present or absent, and whether they directly commit the act
> constituting the offense, aid and abet in its commission, or directly or
> indirectly counsel or procure another to commit the crime, are
> principals.

Only those persons who knowingly participate in planning or executing a crime are

principals to that crime. *State v. Cedrington*, 98-0253 (La.App. 5 Cir. 12/16/98),

725 So. 2d 565, 573 (citation omitted).  Mere presence at the scene of a crime is

not enough to make one a principal.  *Id.*  Moreover, an individual may only be

convicted as a principal for those crimes for which he personally has the requisite

mental state. *Id.* at 573-4.  However, "[i]t is sufficient encouragement that the

accomplice is standing by at the scene of the crime ready to give some aid if

needed, although in such a case it is necessary that the principal actually be aware

of the accomplice's intention." *State v. Page*, 08-531, p.10 (La.App. 5 Cir.

11/10/09), 28 So.3d 442, 449, *writ denied*, 09-2684 (La. 6/4/10), 38 So. 3d 299.

In *State v. Gurganus*, 03-0992 (La. 5 Cir. 12/30/03), 864 So.2d 771,

this Court held that the evidence was sufficient to convict the driver of the get-a-

way car with second degree murder.  In that case, Gurganus drove two of his co-

perpetrators, who were armed with weapons, to a filling station where a robbery

and murder were committed.[4]  Prior to the robbery, one of Gurganus' co-

perpetrators told him that he needed to commit a robbery because he needed some

---

[4] Gurganus gave a statement to the police in which he stated that he thought he was driving his friends around to speak with someone about committing a robbery. He stated that he did not know the robbery was actually going to be committed.

cash. *Id.* at 774. The two then went to pick up the third co-perpetrator. Gurganus

drove the two men to a gas station. The two passengers exited the van and opened

fire. Gurganus, who remained inside the van, ducked down and waited for the two

men to return. Once they returned, Gurganus drove away, abandoned the van, and

returned home to Alabama. In that case, we stated:

> [I]t is evident from Arvel Gurganus's statement that he was with
> David Williams and Darnell Turner for several hours prior to the
> murder and that a robbery was mentioned several times. Furthermore,
> Arvel Gurganus admitted in his statement that he waited for the co-
> perpetrators at the scene and helped them to escape. He did not
> attempt to call police or aid the victim. Instead, he fled to another
> State.

*Gurganus, supra,* at 777.

    Turning to the present case, Navarrete-Duran learned on Wednesday night

that a robbery was going to occur. He was aware that his role in the robbery was to

provide transportation to and from the bar. Complying therewith, he then

transported the four men, three of which he knew were armed, to the Gomez Bar

on October 30, 2008. While inside the bar, he then assisted the other men in

ordering the bar patrons to the rear. Once a gunshot was fired, however,

Navarrete-Duran ran back to his car and nervously waited for his co-perpetrators to

return. He never called the police nor did he attempt to render assistance to anyone

who may have been hurt. Instead, he abandoned three of his co-perpetrators at the

scene, hid in a canal until sundown, and later fled to Texas.

    Viewing the evidence in the light most favorable to the State, this Court

finds that the evidence was sufficient to convince a rational trier of fact that

Navarrete-Duran aided and abetted in the commission of the armed robbery that

resulted in the deaths of the four men. Therefore, this assignment of error is

without merit.

**Conclusion**

We have reviewed the record for errors patent in conformity with *State v. Oliveaux,* 312 So.2d 337 (La.1975) and have found none.  Thus, the convictions and sentences are affirmed.

<u>**AFFIRMED**</u>

No: _____

IN THE
LOUISIANA SUPREME COURT
STATE OF LOUISIANA


STATE OF LOUISIANA
*Respondent/Appellee*


VERSUS


PEDRO A. NAVARETTE -DURAN
*Defendant/Appellant*

## PETITIONER REQUEST THAT THIS WRIT APPLICATION BE GRANTED AND THIS CASE REMANDED

DENIAL OF APPEAL FROM THE FIFTH CIRCUIT, COURT OF APPEAL DOCKET NUMBER: 11-KA-713, BEFORE THE HONORABLE SUSAN M. CHEHARDY, CLARENCE E. McMANUS, AND FREDERICKA HOMBERG WICKER, DECISION RENDERED ON MARCH 13, 2012.

APPEALED FROM THE 24ᵗʰ JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON , LOUISIANA, BEFORE THE HONORABLE JUDGE JOHN J. MOLAISON, JR., PRESIDING, CASE DOCKET NUMBER : 08-5641. DIV. "E"

## APPLICATION FOR WRIT OF CERTIORARI (AND/OR REVIEW)

APPLICATION ON BEHALF OF:

PEDRO A. NAVARETTE -DURAN

**Prepared By:**
**Dannie K. Johnson**
**Offender Counsel Substitute II**


Respectfully submitted

*Pedro Navarrete Duran*
Pedro A. Navarette -Duran, *Pro se*
D.O.C.# 575469 General Delivery
Louisiana State Penitentiary
Angola, La. 70712


CRIMINAL PROCEEDINGS



# COURT RULES
## APPENDIX G. SUPREME COURT OF LOUISIANA
## WRIT APPLICATION FILING SHEET
No _____

## TO BE COMPLETED BY COUNSEL
## or PRO SE LITIGANT FILING APPLICATION

**TITLE**

STATE OF LOUISIANA

VS.

PEDRO A. NAVARETTE -DURAN,

Applicant    Pedro A. Navarette -Duran,

Have there been any other filings in this
Court in this matter? [ ]Yes [X ]no

Are you seeking a Stay Order?  No
Priority Treatment ?         No
If so you MUST complete & attach a
Priority Form

## LEAD COUNSEL PRO SE LITIGANT INFORMATION

**APPLICANT:** Pedro A. Navarette -Duran,         **RESPONDENT:** State of Louisiana
**Name:** Pedro A. Navarette -Duran #575469      **Name:** District Attorney Jefferson Parish
**Address:** CBC  Main Prison Cell Block          **Address:**
La. State Prison, Angola, La. 70712                        Jefferson, Louisiana
**Phone:**_____ **Bar Roll No.**_____        **Phone:**_____ **Bar Roll No.**_____

Pleading being filed: **[X]** In Proper Person,  **[X]** In Forma Pauperis
Attach a list of additional counsel/pro se litigants, their addresses, phone numbers and
the parties they represent.

## TYPE OF PLEADING

[ ] Civil, [X] Criminal, [ ] Bar, [ ] Civil Juvenile, [ ] Criminal Juvenile, [ ] Other
### ADMINISTRATIVE OR MUNICIPAL COURT INFORMATION
Tribunal/Court:_____    Docket No._____
Judge/Commissioner/Hearing Officer:_____    Ruling Date:_____

## DISTRICT COURT INFORMATION

Parish and Judicial District Court: 24th Judicial District No: 08-5641
Judge and Section: Honorable John J. Molaison Date of Ruling/Judgment:Oct 14th 2010

## APPELLATE COURT INFORMATION

Circuit: Fifth Circuit      Filing Date: Aug. 19Th 2011 Docket No.11-KA-0713
Applicant in Appellate Court:_.
Ruling Date: March 13, 2012 Panel of Judges: Susan M. Chehardy, Clarence E. Mcmanus,
and Fredericka Homberg Wicker ,En Banc[ No ]

## REHEARING INFORMATION

Applicant: N/A          Date Filed:  N/A   Action on Rehearing: N/A
Ruling Date:  N/A    Panel of Judges:    N/A        En Banc[   ]

## PRESENT STATUS

[ ]Pre-Trial, Hearing/Trial Scheduled Date:_____, [ ]Trial in Progress, [X] Post Trial
Is there a stay now in effect? No Has this pleading been filed simultaneously in any
other court? No  If so, explain briefly _____    N/A

## VERIFICATION

I certify that the above information and all of the information contained in this application
is true and correct to the best of my knowledge and that all relevant pleadings and rulings, as
required by Supreme Court Rule X, are attached to this filing. I further certify that a
copy of this application has been mailed or delivered to the appropriate court of appeal
(if required), to the respondent judge in the case of a remedial writ, and to all other
counsel and unrepresented parties.

4-4-12
DATE

SIGNATURE

Dannie K. Johnson #104404/Offender Counsel Substitute II/@ LSP Main Prison Law Library Cell Block Team

2

# TABLE OF CONTENTS

WRIT APPLICATION FILING SHEET ........................................2

TABLE OF CONTENTS .........................................................3

ASSIGNMENTS OF ERRORS PRESENTED FOR REVIEW ..............4

ASSIGNMENT OF ERROR  FOR REVIEW NO. 1 .......................4

STATEMENT OF JURISDICTION ..........................................4

STATEMENT OF THE CASE ..................................................4

WRIT GRANT CONSIDERATION ...........................................6

REQUEST FOR JUDICIAL NOTICE ........................................7

STATEMENT OF FACTS .......................................................8

ISSUE OF ERRORS #1 .........................................................10

ARGUMENT OF ERROR#1 ...................................................10

LAW AND ARGUMENT .......................................................11

INSUFFICIENCY OF THE EVIDENCE ...................................11

CONCLUSION ...................................................................16

VERIFICATION AND PROOF OF SERVICE ............................18

EXHIBITS ........................................................................19

## ASSIGNMENTS OF ERRORS PRESENTED FOR REVIEW

### ASSIGNMENT OF ERROR FOR REVIEW NO. 1

1. Did Appellate Court error in not reversing trial court jury guilty verdict against Duran when the State's evidence shown that Duran was a Hispanic man who was in a bar with other Hispanic men when a robbery that went bad and thus killing four people.

### STATEMENT OF JURISDICTION

This Honorable Court has supervisory and original jurisdiction over the Court of Appeal, Fifth Circuit, and the 24th Judicial District Court for the Parish of Jefferson pursuant to Article V., § 5 of the Louisiana Constitution of 1974, as amended, which jurisdiction is invoked in accordance with Rule X, Supreme Court Rules.

### STATEMENT OF THE CASE

On February 26, 2009, the Grand Jury for the Jefferson Parish indicted defendant Pedro A. Navarette -Duran for three counts of Second Degree Murder, which is a violation of LSA-R.S. 14:30.1(A)(2). The State brought the indictment against Duran and four other co-defendants Jose Cornejo-Garcia(Garcia), Renil Escobar-Rivera (Rennie), and Rigoberto Funes (Funes), and his brother, Mario A. Funes.

All four men were originally charged together and all of them were first charged with First Degree Murder. The State elected to indict them on Second Murder. The State and all five of the defendants, including their attorneys and their respective interpreters engaged in a lengthy discovery process because three deaths occurred during an armed robbery following a violent shootout I a local bar in Jefferson Parish named Gomez Bar.

During the discovery proceedings, Duran, along with several other co-

defendants, attempted to have their statements to the police and several items of evidence suppressed before the hearing, but the district court denied all discovery motion except the motion to sever which it granted some time before the instant trial.

The State's evidence consisted of five Hispanic men conspiring to commit an armed robbery of a local bar that had a forty-year history of cashing checks for employees at an insulation business located directly across the street form the bar. On October 20, 2008, the men traveled to the bar and entered the establishment that afternoon.

The men order some beers and appeared to be interested in playing a game of pool until two of the men pull out their handguns and started ordering the patrons to surrender their valuables. One of the owners later cornered Mario Funes, who was standing behind the cash register. A gunfight ensued and ended with the bar owner and two patrons being killed. Funes was severely injured. Duran immediately ran outside the bar and got into his car. He was not armed, and he was not identified as being one of the men who took the patron's valuables form their pockets.

Actually, Duran arrived in the New Orleans area a couple of days earlier and had been staying with his cousin who was one of the Hispanic men involved I the robbery. To Duran, he was simply going to the bar to relax and unwind. He had no idea that the men had conspired to rob this bar.

At trial, Duran did not dispute the fact that several patrons were violently killed during the gunfight nor did he dispute the fact that he owned the vehicle that was parked outside the bar. However, Duran was not a participant in this robbery. None of the patrons remembered seeing him either in the bar or holding a gun to

the patrons. Duran entered the bar with these men, but he was not an active participant with them in their scheme to rob this bar. Duran was forced to leave his cousin, Garcia, at the bar out of fear that he would be implicated in this crime.

When Mario Funes was shot, Duran was scared out of his mind. He spoke very little English, so he knew that he was already at a disadvantage. His will to survive and get away from this situation was all Duran had left. He eventually left Louisiana and went to Texas. It was in Texas that he was later arrested and then questioned by the police about the robbery through a police interpreter.

The jury returned a guilty verdict against Duran based on his menial association with these men, not because he willingly or actively wanted to rob this business with the others. Defense counsel filed a post-trial motion entitled Motion In Arrest of Judgment and Alternatively Motion For New Trial, but this motion was summarily denied. Defense counsel waived all sentencing delays and Duran was sentenced to three consecutive LIFE sentences pursuant to the mandatory sentence provision of LSA-R.S. 14:30.1

The sentences were ordered to be without the benefits of parole, probation or suspension of sentence. Duran was also advised of the two-year period for filling an Application for Post Conviction Relief pursuant to LSA-C. Cr. P. Art. 930.8. It is from his conviction and sentence for the three counts of Second Degree Murder that Duran files the instant appeal.

## WRIT GRANT CONSIDERATIONS

Pursuant to Supreme Court Rule **X**, it is respectfully suggested that this writ should be granted under § 1(a)1. The decision of a Court of Appeal, Fifth Circuit conflicts with their own decisions and other courts of appeal, as well as this Honorable Supreme Court of Louisiana. The Court of Appeal has erroneously

interpreted or applied the constitution or a law of this state or the United States and the decision will cause material injustice or significantly affect the public interest. Pursuant to Supreme Court Rule X, it is respectfully suggested that this writ should be granted pursuant to the provisions of § 1(a)4. The Court of Appeal has erroneously summarily denied relief on the merits. Their decision violates the principles of fairness. Judges *Cooks*, *Genovese* and *Keaty* of the Fifth Circuit, Court of Appeal reasons for affirming Petitioner's conviction and sentence reveals the followings:

"In case concerning Navarrete-Duran learned on Wednesday night that a robbery was going to occur. He was aware that his role in the robbery was to provide transportation to and from the bar. Complying therewith, he then transported the four men, three of which he knew were armed, to the Gomez Bar on October 30, 2008."

The court of appeal further stated: "Navarrete-Duran aided and abetted in the commission of the armed robbery that resulted in the death of four men."

Mr. Navarrette-Duran specifically argues that the court of appeal erred in reviewing his direct appeal for relief. Petitioner disagrees with the court of appeal opinion. Court of Appeal disregarded the fact that Duran never was armed with a gun nor had intention of robbing anyone. The mere fact that Duran did not understand English well, should have gave way to some doubt of his intention. Duran's co-defendants took considerably advantage of Duran. It was not until *after the fact* of the robbery that Duran actually knew what had happen.

### REQUEST FOR JUDICIAL NOTICE

Mr. Navarrette-Duran, respectfully request this Honorable Court to take "Judicial Notice" to the fact that his instant Writ Application for Relief. *WHEN MANDATORY.* "A court shall take judicial notice upon request if supplied with the information necessary for the court to determine that there is no reasonable dispute as to the fact." *Judicial Notice Under Louisiana Code*, Article 201(D), as to the

following:

*The State Court had no authority in finding Mr. Navarrette-Duran guilty of La.
R.S. 14:30.1. There was reasonable doubt all through the case and testimonies of
Mr. Navarrette-Duran and co-defendants. Mr. Navarrette-Duran should have been
charged and indicted on La. R.S. 14:25; Accessories after the fact.*

## STATEMENT OF FACTS

Pedro Navarette-Duran has been involved with music since he was a young
boy. He adored everything about music. He loved listening ti it because it had a
soothing effect on the brain and was a wonderful way to relieve stress. More
importantly, Duran enjoyed playing music. In fact, everyone knew of his love of
music and referred to him as Mariachi, which a group of singing musician who
incorporate the use of violins, trumpets and guitars to play a genre of music that
originated from Western Mexico.

Despite his love of music, Duran needed a job and he knew very little
English. Since Hurricane Katrina, Duran learned that a number of unemployed
Latinos came to Louisiana seeking employment due to the federal grants the city
received for rebuilding. Duran though that he might be able to get a job in
Louisiana and perhaps get a chance to pursue his passion for music during his off
time.

In October 2008, Duran located Jose Cornejo-Garcia, one of his cousins in
the New Orleans area, and drove his car to his cousin's apartment in Metairie. Upon
arriving in Metairie, Garcia welcomed Duran into his home and allowed him to
stay with him until he found a job.

A couple of days later, on October 30, 2008, Garcia, Rennie, and the Funes
brothers decided to go to a local bar called Gomez Bar. They asked Duran to drive
them there since he had a car. Unbeknownst to Duran, Rennie, Garcia and the
Funes brothers had been planning to rob a local bar that was known  to cash

payroll checks for workers at a nearby manufacturing company.

When Duran's came to Garcia's apartment, the three men collectively agreed to use Duran's car as their get-a-way vehicle. Thinking that he was going to the bar and picked up the pool sticks to play a game of pool with his cousin. When the Funes brothers pulled out their handguns and started ordering the patrons to give them their valuables, Duran ran out of the bar.

Duran got into his car. He was nervous and he did not know what to do. He spoke very little English and he knew that everyone was going to think that he was involved in the robbery because he was Hispanic and because he drove them to the bar. He started the engine and started to leave, but he realized that his cousin, Garcia, was still in the bar.

He was not going to leave his family behind. After all, he came to Metairie because he did not know anyone else and because he was staying with his cousin. Suddenly, Duran heard a gunshot. His cousin had not came out of the bar and he saw people running out of the bar. Rennie got into the car and urged him to drive off, but Duran did not want to leave Garcia.

While he was watching the people run out of the bar, Duran heard more gunshots. Seconds later, he saw two of the men he was with carrying a third person who was covered in blood. In his rear-view mirror, Duran saw a police car driving down the street. It was at this point that he panicked and drove away. Rigoberto Funes, the individual who was shot on the scene by Wallace Gomez, the decedent bar owner, was arrested outside the bar.

Duran drove to Rennie's apartment complex, but they went to the apartment of a young woman that Rennie knew. The woman allowed them inside to use the restroom. Duran did not know to trust –especially since his cousin had betrayed

him. All he could think about was how he should not have gone with these men to that bar. Duran could see how nervous the women in the apartment were when they saw that Rennie was covered in blood.

Rennie also had a handgun wrapped in a T-shirt that was covered in blood. Suddenly, Rennie started crying while they were sitting outside the women's apartment. Brandi Diaz tried to console Rennie, but Rennie cried all the more. Duran could not understand what she was saying, but he knew that he did not need to be at the women's apartment any longer than he had to.

The men ultimately left the apartment. Just as Duran arrangement to come to Metairie, he found himself making arrangements to leave. He went to Texas but was later arrested and questioned by Jefferson Parish deputies in a Texas jail. He was cooperative and willingly talked to the police through their interpreter. Duran was charged in the deaths of three of the patrons killed in Gomez Bar on October 30, 2008.

## ISSUE ERROR #1

Did the district court commit reversible error in accepting the jury's guilty against Duran when the State's evidence showed that Duran was a Hispanic man who was in the bar with a group of other Hispanic men until several people were robbed and killed during a robbery?

## ARGUMENT OF ERROR #1

Duran drove to Louisiana in search of employment. He had s relative who lived in the New Orleans area, and he intended to stay with his relative until he found employment and could live on his own. Little did he knew that his cousin had been plotting with three other men to rob a local bar that was known to have large sums of cash on the premises. This bar cashed checks for employees at the

Johns Menville Company, which is a manufacturing company that was located directly across the street from Gomez Bar.

The men told Duran that they were going to the bar to play pool, and Garcia, Duran"s cousin, asked Duran to drive them to the bar. Duran had only been in Louisiana for a few days and since he was staying with his cousin free of charge, he felt obliged to drive the men to the bar. Duran's limited understanding of the English language made him a prime target for these men. They took advantage of Duran and his car. Duran went from playing a friendly game of pool to being wanted for murder ina matter of seconds.

Duran was not a principal to this crime because he lacked the criminal intent to participate in this horrible incident. Duran had only met his cousin's friends a few days earlier. To say that he was an active participant in the robbery and in the death of these men is totally unreasonable and thus, manifestly erroneous.

**LAW AND ARGUMENT**

*Insufficiency of the Evidence*

The crux of the State's case against Duran rests on whether Duran's actions clearly indicated that he was a willing participant in the armed robbery of Gomez Bar with the other four men. While it remains undisputed even on appeal that the State satisfied the requisite elements for both armed robbery and second degree murder as to the other four defendants. Duran challenges his conviction on the premise that he did not act as principal to these offenses by intentionally aiding, abetting, or directly or indirectly counseling either of the co-defendant to commit this said offense.

On appeal, Duran asserts that he had no knowledge of the impending plan to rob the bar and he did not possess a crucial role in the armed robbery sufficient

enough to be charged as a principal. Duran's state of mind at the time he realized the three of the five men were going to rob the bar was to distance himself from them and vacate the premises. For this cause, the district court erred in accepting the jury's verdict and convicting him as a principal in the death of the three men.

Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt . Under the law of principals, a defendant can be found guilty of a felony offense if he served as a principal of the crime by aiding and abetting, directly/ indirectly counseling, or procuring another to commit a crime. So long as the prosecution is able to satisfy the statutory elements of the underlying offense as to one or all of the co-defendants, all that is left for it to do is show that the defendant acted in some way to assist the co-defendants towards accomplishing the felony offense.

Here, the State used Duran's presence in the bar as a sign of his intent to actively participate in the offense. The State also used the fact that Duran was the only one of the five men to have a car as a sign that he was the *"wheelman"* for the group. Again, it was discussed at trial that Duran was present in the bar for the purpose of planning a game of pool and socializing with his cousin and his cousin's friend. Undeniably, Duran did not have the specific intent to kill or hard any of the bar patrons. Further, he did not have the mental element to even participate in an armed robbery of a commercial business to which he had no familiarity. He could not virtually, speak an English and he had never been in Louisiana before.

Thus, to assume that he possessed the knowledge and intent to be charged as a principal in this offense is unreasonable. In addition, when the event turned from a friendly outing into a robbery, Duran quickly exited the bar and would have immediately left the area if it were not for the fact that his cousin was still inside

the bar and he had no where to go if he left his cousin behind.

In *Foy*, the defendant was convicted of armed robbery in state court. After exhausting his state court remedies, the defendant filed a petition for writ of habeas corpus in the federal district court. The federal district court denied his petition, and the defendant appealed to the United State Fifth Circuit. According to the facts, a co-defendant name Shelbia robbed a fast-food restaurant in New Orleans between midnight and 1:30am. Shelbia used a handgun in the robbery by pointing the gun to one of the employees' heads and ordered them to give him the money in the cash register. After getting the money, Shelbia told the employees to lie fact down on the floor as he his exit from the restaurant. None of the employees saw Shelbia leave and they did not know if he left on foot or by car.

The employees reported the incident to the police and while the responding officer was en route to anther location for the same fast-food restaurant, the officer saw a man fitting the description given by the restaurant employees from the first robbery leaving anther restaurant.

The officer also noticed Shelbia getting into a vehicle driven by the defendant. Both men were subsequently arrested and Foy, the man driving the car, was charged as a principal in both robberies. In affirming the defendant's conviction, the U.S. Fifth Circuit rejected the defendant's argument that he was not a principal in these robberies because the defendant's alibi witnesses could not place him at home during the time of the first robbery.

Also, the defendant and his wife were former employees of the same fast-food outlets and the defendant was an assistant manager, making him intimately familiar with this restaurant's procedures. Further, the defendant dropped a handgun while running from the police following the second robbery.

In this case, Duran did not purposefully position himself in his vehicle to wait for the other four men to complete the robbery so they could leave. Duran ran to his car out of shock. He was actually terrified about what these men were doing. He did not leave because his cousin was still in the bar and because he had no where to go nor did he have a way to get into his cousin's apartment to get his belongings.

Duran did not have a handgun as did the defendant in Foy, and he did not exhibit any knowledge about the bar or where the owner kept their money. Considering that Duran arrived in New Orleans just a couple of days before the incident, it is difficult, at best to understand how he knowingly participated in the planning or execution phase of this crime.

Interestingly, the State could have elected not to prosecute Brandi Diaz and Donna Lopez as principals in this armed robbery because these women permitted the men to come into their apartment to use the restroom and get a drink despite the fact that one of them was covered in blood and holding a large object in a shirt also covered in blood.

But the State did not charge these women as principals. The men stayed in the apartment for close to an hour and Diaz was given some of the money from robbery. Diaz was a recovering addict who smoked during her pregnancy and who kept company with a man that her husband did not like. Surely, the law of principals could have applied to these women even more than to Duran. To further illustrate how what evidence the State had to show Duran's intent to participate in his crime, it attempted to use Brandi Diaz's testimony about what she supposedly heard Rennie say to implicate Duran.

> An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state; further, the mental

state of one defendant may not be imputed to another defendant.

Defense counsel timely objected to the State's attempt at using hearsay evidence to implicate Duran. Defense counsel strenuously argued that the use of this hearsay testimony would violate Duran's Sixth Amendment right to cross-examine his accusers since Rennie had already been convicted at the time of Duran's trial and would undoubtedly plea the *fifth* if the defense were to call him as a witness.

The district court ruled to limit Diaz's testimony to what she heard and saw and not include what Rennie or any one else said while the men were in the apartment. Naturally, the State strenuously objected to the court's ruling. The State even used sarcasm towards the district court and it was quite aggressive with the court when it did not receive the ruling it expected.

The State even went so far as to appeal the trial judge's history as a former prosecutor to get the initial ruling reversed. This was a horrible crime and a terrible tragedy to the victim's families and to those patrons who frequented Gomez Bar for the past four decades.

However, Duran was not a party to this armed robbery. He never actively participated in the offense and he did not aid, abet, or counsel any of the four men in this incident. Unfortunately, Duran was convicted because he was of the same nationally as the other four men with him. He spoke very little English and he was unemployed. All Duran had was a compact car and a willingness to work. That is why he was in Louisiana in the first place.

The State's case-in-chief was comprised of evidence that implicated the other four men, but not Duran. The other four men either planned the entire robbery, brandished firearms to intimidate the bar owners and their patrons or took

valuables from their pockets. Duran, on the other hand, was in the wrong place and with the wrong people. He initially trusted his cousin, Garcia, but that turned out to be very disappointed for him.

Although Rennie was the master mind behind the robbery, Duran was in his company following the robbery only because he was virtually homeless without his cousin. He did not condone the robbery. If Duran was not engaged in the perpetration of an armed robbery then he could not be convicted as a principal in the death of the three men who were killed in the robbery.

Hence, the guilty verdict entered against Duran in the instant matter could not satisfy the *Jackson* standard of review because a rational trier of fact could not logically believe that the State's evidence proved that Duran was a principal in this robbery beyond a reasonable doubt.

## CONCLUSION

At last, Mr. **Navarrette-Duran** conviction and sentence must be set aside and the case remanded to the trial court for proceedings or in the alternative order an evidentiary hearing on this matter. Furthermore, Relator moves this Honorable Court to order all records up from the Fifth Circuit, Court of Appeal, No: 11-KA-0713 WHEREFORE, it is prayed that: this application and all pleadings relevant to this affair be deemed adequate and sufficient thereby granting this writ application in the interest of justice; that supervisory writs, remedial, certiorari, (or review) issue herein directed to the Honorable Jon A. Gegenheimer Clerk of Court, to direct the district court to transmit to this Honorable Court on or before a day appointed, the "entire record in these proceedings" in order that the proceedings herein may be inquired into by this Court and their validity ascertained and determined. In the event such writs or any of them are granted, upon hearing of

this Honorable Court such writ or writs be made peremptory and judgment be rendered in favor of Relator, **Mr. Navarrette-Duran**, reversing the judgment of the district court;(alternatively, provide a written judgment);rendering such judgment or issues such orders to which Relator is entitled in the premise, and that **Mr. Navarrette-Duran** be accorded any other needful writs, orders and decrees and such additional relief that he may be entitled to under the law and jurisprudence of this United States of America or the State of Louisiana.

**RELATOR FURTHER PRAYETH NAUGHT**, this _4th_ day

of _April_ , 2012.

Respectfully submitted by:

_Pedro Navarrete Duran_

Mr. Navarrette-Duran, *Pro se*

D.O.C.# 575469-General Delivery

Louisiana State Penitentiary

Angola, La. 70712

## VERIFICATION OF APPLICATION FOR WRITS

**STATE OF LOUISIANA**

**WEST FELICIANA PARISH**

Realtor personally came appeared **Mr. Pedro Navarrette-Duran**, who having been first duly sworn, deposed and say:

1.    He is the Realtor in these proceedings and solely responsible for the contents;

2.    A true copy of this application was provided to the, District Court's Clerk of Court office; and the office of the District Attorney, 24th Judicial District, for the Parish of Jefferson. Each properly addressed and mailed first-class postage, on the date indicated below;

3.    Any of the documents annexed hereto and filed herewith are true and correct copies of the original documents filed in the record;

4.    All of the allegations contained in the above foregoing application for writs are true and correct to the best of my knowledge, information and belief.


### NOTARIZATION

SWORN AND SUBSCRIBED TO before me on this 4th day of April _____, 2012.


_Pedro Navarrete Duran_
**Mr. Pedro Navarrette-Duran,**(AFFIANT)



_____
**A PERSON AUTHORIZED
TO ADMINISTER OATHS
NOTARY**

No: _____

IN THE
LOUISIANA SUPREME COURT
STATE OF LOUISIANA


STATE OF LOUISIANA
*Respondent/Appellee*


VERSUS


PEDRO NAVARRETTE-DURAN
*Defendant/Appellant*


# EXHIBITS SUPPORTING WRIT APPLICATION

**MAY IT PLEASE THE COURT:**

PETITIONER SUBMIT THE FOLLOWING EXHIBITS

APPELLANT ORIGINAL BRIEF AS **EXHIBIT "A"**

STATE OF LOUISIANA BRIEF AS **EXHIBIT "B"**

FIFTH CIRCUIT, COURT OF APPEAL DECISION AS **EXHIBIT "C"**


Respectfully submitted By


*Pedro Navarrete Duran*
Mr. Navarrette-Duran, *Pro se*
D.O.C.# 575469-General Delivery
Louisiana State Penitentiary
Angola, La. 70712

# The Supreme Court of the State of Louisiana

**STATE OF LOUISIANA**

NO.  2012-KO-0840

VS.

**PEDRO A. NAVARETTE-DURAN**

— — — — —

IN RE:  Navarrete-Duran, Pedro A.; – Defendant; Applying For Writ of
Certiorari and/or Review, Parish of Jefferson,  24th Judicial
District Court Div. E, No. 08-5641; to the Court of Appeal, Fifth
Circuit, No. 11-KA-713;

— — — — —

**November 9, 2012**

Denied.

JLW

BJJ

JPV

JTK

MRC

GUIDRY, J.,  recused.

Supreme Court of Louisiana
November 9, 2012

_Rachel Adelman_
Chief Deputy  Clerk of Court
              For the Court

E

TWENTY-FOURTH JUDICIAL DISTRICT COURT

PARISH OF JEFFERSON

STATE OF LOUISIANA


NO: 08-5641                              DIVISION E



STATE OF LOUISIANA

VERSUS

PEDRO A. NAVARRETE-DURAN



Motion Hearing and Sentencing held in the above

numbered and entitled cause in open Court on

Monday, October 20th, 2010; before the Honorable

John J. Molaison, Jr.; Judge presiding.



APPEARANCES:

    GEORGE WALLACE, Esquire
    ED CLIFF MILNER, Esquire
    Assistant District Attorneys

    TRACY G. SHEPPARD, Esquire
    Attorney for Defendant



Reported by: Don A. Theriot, CCR

1

F

```
1                    P R O C E E D I N G S
2      MR. MILNER:
3            The next matter on the Docket is Number
4      Six; Pedro Navarrete-Duran.  He's in the
5      box, Your Honor.
6      MS. SHEPPARD:
7            Your Honor, Tracy Sheppard on behalf
8      of Mr. Navarrete-Duran.
9      THE COURT:
10           Lets swear the Interpreter in.
11     THE WITNESS:
12           George Wallace and E. Cliff Milner on
13     behalf of the State.
14           LESTER PADILLA, Spanish Interpreter, after
15  having been first duly sworn, testified on his oath
16  as follows:
17     MINUTE CLERK:
18           State your name for the record.
19     MR. PADILLA:
20           Lester Padilla; P-A-D-I-L-L-A.
21     THE COURT:
22           Alright.  We have the interpreter
23     equipment.
24     MR. PADILLA:
25           Yes Your Honor.
26     THE COURT:
27           Is it working properly?
28     MR. PADILLA:
29           Yes sir.
30     THE COURT:
31           Alright.  And the Defense also has
32     their own Interpreter.
```

1    MS. SHEPPARD:

2        Ms. Annie Jane Laurence is present Your

3    Honor.

4    THE COURT:

5        And you also have a translating device.

6    It's working now?

7    MS. LAURENCE:

8        Yes it is.

9    THE COURT:

10        Alright.  We're here for Sentencing.

11    MS. SHEPPARD:

12        That's correct.  And Your Honor, I

13    did file a Motion for New Trial.  I served

14    a copy on the State, and it's today the date

15    for the Motion Your Honor.

16    THE COURT:

17        Denied.

18    MS. SHEPPARD:

19        Note our Objection for the record

20    Your Honor.

21    THE COURT:

22        I don't have to delay Sentencing.  Are

23    you waiving?

24    MS. SHEPPARD:

25        We waive any delays and we're ready

26    for Sentence today Your Honor.

27    THE COURT:

28        Alright.

29    THE WITNESS:

30        Your Honor, the State is going to

31    present two witnesses.

32    THE COURT:

1           Alright.  Who are the two witnesses?

2     MR. WALLACE:

3           Betty Carmadelle. Ms. Carmadelle, are

4       you ready Ma'am?

5     MS. CARMADELLE:

6           Yes.

7     THE COURT:

8           Two witnesses.  Who are the two?

9       It's Betty Carmadelle and who else?

10    MR. WALLACE:

11          Betty Carmadelle and Bridget Lambert.

12    THE COURT:

13          Alright.  Why don't Ms. Carmadelle

14      and Ms. Lambert and Counsel approach the

15      bench.

16              (Bench Conference)

17    THE WITNESS:

18          Your Honor, that's all the State is

19      prepared to submit in connection with this

20      matter.

21    THE COURT:

22          Defense.

23    MS. SHEPPARD:

24          Your Honor, I've discussed with my

25      client his right to make a statement

26      today, and we decided he will not make a

27      statement today.

28          Request Sentencing.  We're ready for

29      Sentencing.

30    THE COURT:

31          Alright Mr. Duran; I sat as Judge and

32      presided over the Trial of your case.  And

4

1    I have listened to the arguments of your

2    Attorney throughout the trial,

3    particularly during Closing Arguments to

4    the Jury.  I've also listened to victim

5    impact statements that were given today.

6    And one of the facts that I gleaned from

7    the testimony at Trial, and was mentioned

8    by the last victim impact statement given

9    is the fact that this crime could not have

10   occurred without your active participation

11   in providing the vehicle.

12        The facts developed at Trial through

13   your own statements to law enforcement -

14   while you arguably cooperated, is the fact

15   that you are a musician who came to New

16   Orleans to perform on Bourbon Street and

17   ran across your co-defendants for the

18   first time - having met total strangers,

19   you then decided to room with them, and

20   discussion immediately turned to robbing

21   Gomez's Bar.

22        You provided the vehicle.  You drove

23   all of the co-defendants to the site.  You

24   were aware that they were armed with

25   dangerous weapons, specifically guns.  And

26   you actively participated in the crime.

27   You actually entered the bar with your co-

28   defendants.

29        Despite the fact that you did not

30   handle a weapon, specifically pull the

31   trigger or directly take the life of the

32   two individuals for which you were tried,

1   you were the catalyst for the entire

2   operation that afternoon.

3        And that the Court finds specifically

4   troubling is that gentlemen who were

5   enjoying an afternoon an a barroom amongst

6   friends were robbed at gunpoint.  And

7   what's most important is that they were

8   physically searched.  All personal items

9   were removed of any value, and it was

10  apparent that they were unarmed.  And then

11  when the series of events became bad for

12  you and your co-defendants, your co-

13  defendants went back into the bar, two of

14  them.  And then shot and killed two

15  additional victims.

16       Though everyone was well aware of an

17  unarmed, you stayed behind in the vehicle,

18  with the vehicle running and you waited to

19  assist your co-defendants in an attempt to

20  make your escape good.

21       All life has value.  And the Sentence

22  that the Court must hand down is

23  mandatory.  I have very little discretion.

24  And that discretion is limited to running

25  Sentences concurrent or consecutive.

26  Because three lives were taken, and you

27  were convicted of Three Counts of Second

28  Degree Murder, on each Count I'm

29  Sentencing you to Life Imprisonment at

30  Hard Labor in the custody of the

31  Department of Corrections, without the

32  benefit of parole, probation or suspension

1  of sentence.  And those three Sentences

2  are to be served consecutive to one

3  another.

4       You are also notified that you have

5  Two years after conviction and sentence

6  become final to seek post-conviction

7  relief, and thirty days to appeal the

8  Sentence.

9       You are remanded to the custody of the

10  Department of Corrections to begin serving

11  your Sentence.

12  MS. SHEPPARD:

13       Your Honor, just note our objection

14  for the record and my intention to file a

15  Motion for Appeal.

16  THE COURT:

17       So Ordered.  Alright; thank you.

18            (End of Proceedings)

CERTIFICATE


I, Don A. Theriot, CCR, do hereby certify that the foregoing pages of testimony are a true and
correct copy and transcribed to the best of my ability and
understanding of the Motion Hearing & Sentencing held in the case of
STATE OF LOUISIANA VERSUS PEDRO A. NAVARRETE-DURAN
Case No. 08-5641
on October 20th, 2010 before the Honorable John J. Molaison, Jr.; Judge presiding.


January 8th, 2011



DON A. THERIOT; CCR, CDR
STATE OF LOUISIANA

OFFICIAL SEAL
DON A. THERIOT
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 73621
Certificate expires 12-31-11

# APPENDIX

# VERDICT

# SENTENCE

1    Foreperson, would you hand the

2    verdict form to the Bailiff?

3         All right.  The verdict form is

4    correct.

5         Miss Clerk, please read the

6    verdict.

7  THE CLERK:

8         The 24th Judicial District Court,

9    Parish of Jefferson, State of Louisiana,

10   Case Number 08-5641, Division E, State of

11   Louisiana versus Pedro Navarrete-Duran.

12        Verdict, count one:  We, the jury,

13   find the Defendant guilty of second

14   degree murder.  Gretna Louisiana this

15   14th day of October, 2010.  Signed, the

16   Foreperson, Michael Nixdorff.

17        Verdict, count three:  We, the

18   jury, find the Defendant guilty of second

19   degree murder.  Gretna, Louisiana, this

20   14th day of October, 2010.  Signed

21   Foreperson Michael Nixdorff.

22        Verdict, count four:  We, the jury,

23   find the Defendant guilty of second

24   degree murder.  Gretna, Louisiana, this

25   14th day of October, 2010.  Signed

26   Foreperson Michael Nixdorff.

27  THE COURT:

28        All right.  The verdict, as I said,

29   is correct as to form.

30        Any motions?

31  MS. SHEPPARD:

32        Request polling, Your Honor.