**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **PEDRO NAVARETTE-DURAN** | **CIVIL ACTION** |
| **versus** | **NO. 15-1230** |
| **N. BURL CAIN, WARDEN** | **SECTION: "H" (3)** |

**REPORT AND RECOMMENDATION**

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that the matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Pedro Navarette-Duran,[1] is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On October 14, 2010, he was convicted of three counts of

[1] Petitioner's surname appears in the state court record as both Navarette-Duran and Navarrete-Duran.

second degree murder under Louisiana law.[2] On October 20, 2010, he was sentenced on each count to a consecutive term of life imprisonment without benefit of parole, probation, or suspension of sentence.[3] On March 13, 2012, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[4] His related writ application was then denied by the Louisiana Supreme Court on November 9, 2012.[5]

On or about June 18, 2013, petitioner filed an application for post-conviction relief with the state district court.[6] That application was denied on September 13, 2013, and December 4, 2013.[7] His related writ applications were then likewise denied by the Louisiana Fifth Circuit Court of Appeal on March 28, 2014,[8] and by the Louisiana Supreme Court on January 16, 2015.[9]

---

[2] Transcript of October 14, 2010, p. 158; State Rec., Vol. VIII of XI, p. 1800; see also Minute entry dated October 14, 2010; State Rec., Vol. III of XI, pp. 521-22.

[3] Transcript of October 20, 2010, pp. 6-7; State Rec., Vol. VIII of XI, pp. 1811-12; see also Minute entry dated October 20, 2010; State Rec., Vol. III of XI, p. 518.

[4] State v. Navarrete-Duran, 90 So.3d 1152 (La. App. 5th Cir. 2012); State Rec., Vol. II of XI, pp. 480-89.

[5] State v. Navarette-Duran, 101 So.3d 950 (La. 2012); State Rec., Vol. II of XI, p. 490.

[6] State Rec., Vol. II of XI, pp. 282-308. Petitioner had also filed a prior application for post-conviction relief; however, that application was dismissed without prejudice at his request. See Order dated April 3, 2013; State Rec., Vol. II of XI, p. 341.

[7] Orders dated September 13, 2013, and December 4, 2013; State Rec., Vol. I of XI, pp. 23-25 and 47.

[8] Navarette-Duran v. Cain, No. 14-KH-125 (La. App. 5th Cir. Mar. 28, 2014); State Rec., Vol. I of XI, pp. 11-12.

[9] State *ex rel.* Navarette-Duran v. State, 157 So.3d 1126 (La. 2015); State Rec., Vol. I of XI, p. 9.

On or about April 16, 2015, petitioner filed the instant federal application for *habeas corpus* relief, arguing that there was insufficient evidence to support his convictions.[10] The state does not argue that the application is untimely, that petitioner failed to exhaust his remedies in the state courts, or that his claim is procedurally defaulted; on the contrary, the state expressly waives those defenses.[11]

I. Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of the instant case as follows:

> Navarrete-Duran relocated from El Salvador sometime between the years of 2000 and 2001 to Katy, Texas and later met Jose Garcia-Cornejo ("Garcia") in Houston, Texas in August of 2008. The two men, who were both musicians, collaborated and played small musical sessions in the Houston area. Navarrete-Duran and Garcia later traveled from Texas to New Orleans in Navarrete-Duran's 2006 Honda Accord to look for work. They arrived in New Orleans on Monday, October 27, 2010, where they met Renil Escobar-Riveria ("Escobar"), for the first time, on Bourbon Street. Navarrete-Duran informed Escobar that he and Garcia had no place to live. Escobar then invited the two men to reside with him at his apartment on Orange Blossom – an apartment complex in Jefferson Parish, Louisiana. When the men arrived at Escobar's apartment on Monday night, they also met the Funes brothers – Rigoberto and Mario – for the first time. Together, these five men would conspire to commit the armed robbery that would occur three days later at the Gomez Bar. On Wednesday, October 29, 2008, the night before the robbery, Escobar informed the other four men that they would rob the bar where the old men were because a lot of cash was stored there.[FN1] Escobar supplied the weapons for the robbery, arming himself with a .357 magnum, while providing Mario and Rigoberto with a .380

[10] Rec. Doc. 1.

[11] Rec. Doc. 12, p. 5.

semi-automatic and a .22 handgun, respectively. Navarrete-Duran's contribution to the crime was the use of his 2006 Honda Accord.

> [FN1] Gomez Bar was a community bar that also provided check cashing services.

The next day, October 30, 2008, the five men got inside Navarrete-Duran's car and traveled to Gomez Bar to commit the robbery. Navarrete-Duran was in the driver's seat; Mario sat next to him in the front passenger's seat; and Escobar, Garcia and Rigoberto were seated in the rear. Once the men arrived at the bar, Navarrete-Duran backed into a parking space near the front entrance. The men then exited the bar [sic] and went inside. Escobar and the Funes brothers concealed their weapons. Navarrete-Duran and Garcia were unarmed.

The five men played pool and drank beer for approximately twenty minutes. Suddenly, Escobar brandished his weapon and disappeared into a back room while holding a gun to the back of the co-bar owner's head. Meanwhile, the other four men began robbing the bar patrons – removing contents from their pockets. A shot was fired from the back, and Escobar came running back into the bar yelling "let's go." Navarrete-Duran, Garcia, Rigoberto, and Escobar fled from the bar, but Mario remained inside. Mario was behind the bar counter picking up money that had fallen from the cash register. When the other four men got outside, Navarrete-Duran jumped into the driver's seat of his vehicle, and Garcia jumped into the front passenger seat. Upon hearing more shots from within the bar, the men realized Mario was still inside. Escobar and Rigoberto returned to the bar with their guns drawn.

Inside the bar, Mario lie [sic] wounded on the floor. Wallace Gomez, one of the bar owner's [sic], was dead on the floor near the pool table. His brother, Beauford Gomez, was also dead on the floor near the bar. Seeing his brother on the floor, presumably dead, Rigoberto immediately opened fire with his .22, firing multiple shots and ultimately killing two other bar patrons. Rigoberto and Escobar then dragged Mario from the bar and headed toward the front door.

Meanwhile, outside of the bar, Mr. Charles Henning was parked next to the Honda Accord, which was occupied by the two Hispanic males. While sitting there, Mr. Henning's friend opened his truck door and asked whether he heard gunshots. Mr. Henning, however, had not heard anything because his windows were rolled up, and the truck's engine and air conditioner were running. When

Mr. Henning looked up, he noticed that the man in the driver's seat of the Honda Accord was staring directly at him and appeared to be extremely nervous. He then looked towards the bar and observed three men exiting – one of whom had blood dripping from his head and abdomen. Observing this suspicious behavior, Mr. Henning backed out of the parking lot into an adjacent lot. The Honda Accord, which was parked next to him, had backed into the parking space, which allowed Mr. Henning the opportunity to jot down the front Texas license plate number.

After Rigoberto and Escobar exited the bar with Mario, they observed a police officer driving down the street. Escobar abandoned the two men, jumped in the back seat of Navarrete-Duran's car and ordered Garcia out to help the Funes brothers. When Garcia exited the car, however, Escobar held a gun to the back of Navarrete-Duran's head and ordered him to drive away. Navarrete-Duran drove to the Tallowtree Apartments where Brandi Lopez, Escobar's friend, lived. While there, Navarrete-Duran and Escobar drank water from separate wine glasses. Brandi noticed blood on Escobar's clothing and asked him what was wrong. He explained that he and Navarrete-Duran had gotten into a fight down the street. Escobar then went into the bathroom to clean up. Afterwards, Brandi, Escobar, and Navarrete-Duran went outside where they each smoked cigarettes, discarding the butts on the ground.

While outside, Brandi observed a shirt on the ground that she had seen Escobar wear numerous times. When she picked the shirt up, two guns fell out. Escobar picked up the guns off the ground, wrapped them back in the shirt, and took a towel that was hanging on the outside railing and wrapped it around the shirt. Brandi then told the two men to leave. As they stood there, however, police began to fill the area. Escobar cried and told Brandi that he thought Mario was dead. While Escobar was speaking, Navarrete-Duran continually ordered him to be quiet. The two men eventually fled the scene and hid in a canal until sundown.

The police obtained the license-plate number of the 2006 Honda Accord from Mr. Henning and learned that it was registered to Navarrete-Duran. The investigation ultimately led them to the Tallowtree Apartments, where the car had been abandoned. Upon questioning residents in the area, police learned that the occupants of the car had been seen entering apartment 406. The police went to that apartment where Brandi and Donna Lopez – the actual leaseholder – confirmed that the two men had been there. The police then obtained a consent to search the apartment, and seized, *inter*

> *alia*, a wine glass and the three cigarette butts that had been discarded on the ground. Later that evening, the police escorted Mr. Henning to the Tallowtree Apartments, where he identified the 2006 Honda Accord as the same car he had seen at the Gomez Bar earlier that day.
>
> Approximately one week after the murders occurred, Navarrete-Duran was arrested in Houston, Texas. Det. Keith Locascio, the lead detective, along with Det. David Canas, traveled to Houston on November 7, 2008, to interview Navarrete-Duran. Det. Canas, who was fluent in both Spanish and English, accompanied Det. Locascio for the sole purpose of serving as a translator for both Navarrete-Duran and Det. Locascio. When the detectives arrived in Houston, Navarrete-Duran was advised of his Miranda rights in Spanish. He also signed a Spanish Rights of Arrestee form in which he indicated that he understood his rights and wished to waive them.
>
> Navarrete-Duran stated that he and Garcia, whom he had only known for about two months, arrived in New Orleans the Monday before the robbery. He further stated that he did not know Escobar or the Funes brothers before arriving in New Orleans. He stated that Escobar had planned the robbery the night before it occurred and that he was present during that meeting. He admitted driving his car to and from the robbery but stated that he was not armed with a weapon.[12]

## II. Petitioner's Claim

Petitioner claims that there was insufficient evidence to support his convictions. On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> In his sole assignment of error, Navarrete-Duran contends that the evidence was insufficient to convict him as a principal to second degree murder.
>
> In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven

[12] State v. Navarrete-Duran, 90 So.3d 1152, 1153-55 (La. App. 5th Cir. 2012); State Rec., Vol. II of XI, pp. 480-85.

beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In this case, Navarrete-Duran was convicted of three counts of second degree murder, a violation of La. R.S. 14:30.1. Second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of certain enumerated felonies, included [sic] armed robbery. La. R.S. 14:30.1(A)(2). The evidence in this case overwhelmingly indicates that Navarrete-Duran was not armed with a weapon during the commission of the armed robbery that occurred at the Gomez Bar. However, La. R.S. 14:24 provides:

> [A]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Only those persons who knowingly participate in planning or executing a crime are principals to that crime. State v. Cedrington, 98-0253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 573 (citation omitted). Mere presence at the scene of a crime is not enough to make one a principal. Id. Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. Id. at 573-74. However, "[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention." State v. Page, 08-531, p. 10 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, writ denied, 09-2684 (La. 6/4/10), 38 So.3d 299.

In State v. Gurganus, 03-0992 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, this Court held that the evidence was sufficient to convict the driver of the get-away car with second degree murder. In that case, Gurganus drove two of his co-perpetrators, who were armed with weapons, to a filling station where a robbery and murder were committed.[FN4] Prior to the robbery, one of Gurganus' co-perpetrators told him that he needed to commit a robbery because he needed some cash. Id. at 774. The two then went to pick up the third co-perpetrator. Gurganus drove the two men to a gas station. The two passengers exited the van and opened fire. Gurganus, who remained inside the van, ducked down and waited for the two men to

return. Once they returned, Gurganus drove away, abandoned the van, and returned home to Alabama. In that case, we stated:

> [I]t is evident from Arvel Gurganus's statement that he was with David Williams and Darnell Turner for several hours prior to the murder and that a robbery was mentioned several times. Furthermore, Arvel Gurganus admitted in his statement that he waited for the co-perpetrators at the scene and helped them to escape. He did not attempt to call police or aid the victim. Instead, he fled to another State.

Gurganus, *supra*, at 777.

> [FN4] Gurganus gave a statement to the police in which he stated that he thought he was driving his friends around to speak with someone about committing a robbery. He stated that he did not know the robbery was actually going to be committed.

Turning to the present case, Navarrete-Duran learned on Wednesday night that a robbery was going to occur. He was aware that his role in the robbery was to provide transportation to and from the bar. Complying therewith, he then transported the four men, three of which he knew were armed, to the Gomez Bar on October 30, 2008. While inside the bar, he then assisted the other men in ordering the bar patrons to the rear. Once a gunshot was fired, however, Navarrete-Duran ran back to his car and nervously waited for his co-perpetrators to return. He never called the police nor did he attempt to render assistance to anyone who may have been hurt. Instead, he abandoned three of his co-perpetrators at the scene, hid in a canal until sundown, and later fled to Texas.

Viewing the evidence in the light most favorable to the State, this Court finds that the evidence was sufficient to convince a rational trier of fact that Navarrete-Duran aided and abetted in the commission of the armed robbery that resulted in the deaths of the four men. Therefore, this assignment of error is without merit.[13]

---

[13] State v. Navarrete-Duran, 90 So.3d 1152, 1156-57 (La. App. 5th Cir. 2012); State Rec., Vol. II of XI, pp. 486-88.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[14]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, the Court finds that petitioner has made no such showing.

Regarding the "contrary to" clause of § 2254(d)(1), the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Here, the state court's decision was not "contrary to" clearly established federal law in either of those respects. The state court correctly identified and then applied the clearly established federal law applicable to claims challenging the sufficiency of evidence: Jackson v.

[14] State v. Navarette-Duran, 101 So.3d 950 (La. 2012); State Rec., Vol. II of XI, p. 490.

Virginia, 443 U.S. 307 (1979). Additionally, petitioner does not point to, and this Court has not found, a United States Supreme Court case with "materially indistinguishable facts." Therefore, the state court decision simply cannot be said to run afoul of the "contrary to" clause of § 2254(d)(1).

As a result, petitioner is entitled to relief only if he shows that the state court's decision constituted an "unreasonable application of" clearly established federal law. That is a formidable task. Regarding the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). That standard significantly restricts the Court's discretion in several respects.

First, the Supreme Court has expressly cautioned that "an unreasonable application is different from an incorrect one." Bell v. Cone, 535 U.S. 685, 694 (2002). Therefore, on *habeas* review, "an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable." Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011). As the United States Supreme Court has explained:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, *not a substitute for ordinary error correction through appeal*. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification

> that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added).

Second, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011); accord Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

Third, this Court's discretion is further restricted by the fact that Jackson standard to be applied is already highly deferential. Specifically, in a Jackson analysis, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis added); accord Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) ("The Jackson inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." (quotation marks omitted)). Because the state court's decision applying that already deferential standard must be assessed here under the narrow standards of review mandated by the AEDPA, the standard to be applied by this Court on *habeas* review is in fact "twice-deferential." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Under these strict guidelines, there is simply no basis for concluding that the state court's decision was "unreasonable." As noted, petitioner was convicted of second degree murder, and Louisiana courts have explained:

> Second degree murder is defined by La. R.S. 14:30.1(A)(2) as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies .... State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La. 12/15/06), 944 So.2d 1277. One need not possess specific intent to kill or inflict great bodily harm to be a principal to second degree felony murder. State v. Gurganus, 03-992 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, 775, writ denied, 04-0254 (La. 6/4/04), 876 So.2d 75. Rather, under the felony murder doctrine, the State need only prove the commission of the underlying felony or the attempt thereof. Lewis, 917 So.2d at 590.

State v. Cammatte, 101 So.3d 978, 982 (La. App. 5th Cir. 2012). Armed robbery is one of the enumerated felonies which can support a conviction for second degree murder. La. Rev. Stat. Ann. § 14:30.1(A)(2).

In the instant case, petitioner concedes that Jose Garcia-Cornejo, Renil Escobar-Riveria, Rigoberto Funes, and Mario Funes went to the Gomez Bar to commit armed robbery and that three victims were murdered during the perpetration of the crime. Although petitioner himself was unarmed, that is not determinative; an individual can be a principal to the crime of armed robbery even if he is not personally armed. See, e.g., State v. Dominick, 354 So.2d 1316, 1320 (La. 1978); State v. McCartney, 684 So.2d 416, 429 (La. App. 3rd Cir. 1996). Further, because petitioner was engaged in armed robbery at the time the victims were murdered, whether or not he had the intent to kill or inflict great bodily harm is irrelevant. La. Rev. Stat. Ann. § 14:30.1(A)(2); McCartney, 684 So.2d at 429.

It is true that petitioner now alleges that he was unaware of the plan to commit armed robbery. However, the evidence presented at trial, including his own admissions made to Detectives Keith Locascio and David Canas, showed that he *was* involved in the planning of the crime and aided and abetted its commission by driving the getaway car. That evidence, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to have found petitioner to be a principal to the crime of armed robbery and, because the instant victims were killed during the perpetration of that crime, to further find him guilty of second degree murder beyond a reasonable doubt.

In summary, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly deferential standards of review which must be applied by this federal *habeas* court, the claim should be denied.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **Pedro Navarette-Duran** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[15]

New Orleans, Louisiana, this twenty-seventh day of July, 2015.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

[15] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.